# MARYLAND ET AL. *v.* LOUISIANA

No. 83, Orig.   Argued January 19, 1981—Decided May 26, 1981

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 760. REHNQUIST, J., filed a dissenting opinion, *post*, p. 760. POWELL, J., took no part in the consideration or decision of the case.

*Stephen H. Sachs,* Attorney General of Maryland, argued the cause for plaintiffs. With him on the briefs were *David H. Feldman, Diana Gribbon Motz,* and *Robert A. Zarnoch,* Assistant Attorneys General of Maryland; *Tyrone C. Fahner,* Attorney General of Illinois, *Hercules F. Bolos,* Special Assistant Attorney General, and *Thomas J. Swabowski,* Assistant Attorney General; *Theodore L. Sendak,* Attorney General of Indiana, and *William E. Daily* and *Robert B. Wente,* Deputy Attorneys General; *Francis X. Bellotti,* Attorney General of Massachusetts, and *Alan D. Mandl,* Assistant Attorney General; *Frank J. Kelley,* Attorney General of Michigan, *Robert A. Derengoski,* Solicitor General, and *Arthur E. D'Hondt, Don L. Keskey,* and *John M. Dempsey,* Assistant Attorneys General; *Robert Abrams,* Attorney General of New York, *Shirley A. Siegel,* Solicitor General, and *Paulann M. Caplovitz* and *Richard W. Golden,* Assistant Attorneys General; *Dennis J. Roberts II,* Attorney General of Rhode Island, and *Stephen Lichatin III,* Assistant Attorney General; and

*Bronson C. La Follette,* Attorney General of Wisconsin, *Charles A. Bleck,* Assistant Attorney General, and *Steven M. Schur.*

*Stuart A. Smith* argued the cause for intervenors United States et al. With him on the briefs were *Solicitor General McCree, Jerome M. Feit,* and *J. Paul Douglas.*

*Frank J. Peragine* argued the cause for intervenor pipeline companies. With him on the briefs were *H. Paul Simon, C. McVea Oliver, William W. Brackett, Daniel F. Collins, Arthur J. Waechter, Jr., Herschel L. Abbott, Jr., Gene W. Lafitte, John M. Wilson, Ernest L. Edwards, Margaret R. Tribble, James H. Napper II,* and *Melvin Richter.*

*Eugene Gressman* and *Robert G. Pugh* argued the cause for defendant. With them on the briefs were *William J. Guste, Jr.,* Attorney General of Louisiana, *Carmack M. Blackmon,* Assistant Attorney General, and *William C. Broadhurst.*[*]

JUSTICE WHITE delivered the opinion of the Court.

In this original action, several States, joined by the United States and a number of pipeline companies, challenge the constitutionality of Louisiana's "First-Use Tax" imposed on certain uses of natural gas brought into Louisiana, principally from the Outer Continental Shelf (OCS), as violative of the Supremacy Clause and the Commerce Clause of the United States Constitution.

I

The lands beneath the Gulf of Mexico have large reserves of oil and natural gas. Initially, these reserves could not be developed due to technological difficulties associated with offshore drilling. In 1938, the first drilling rig was constructed off the coast of Louisiana, and with the advent of new tech-

---

[*]*Frederick Moring* filed a brief for Associated Gas Distributors as *amicus curiae.*

nologies, offshore drilling has become commonplace.[1] Exploration and development of the OCS in the Gulf of Mexico have become large industries providing a substantial percentage of the natural gas used in this country.[2] Most of the gas being extracted from the lands underlying the Gulf is piped to refining plants located in coastal portions of Louisiana where the gas is "dried"—the liquefiable hydrocarbons gathered and removed—on its way to ultimate distribution to consumers in over 30 States. It is estimated that 98% of the OCS gas processed in Louisiana is eventually sold to out-of-state consumers with the 2% remainder consumed within

---

[1] The earliest offshore oil production occurred in 1896 off the coast of California. The early ventures were extensions of onshore drilling projects. U. S. Dept. of Interior, Mineral Resource Management of the Outer Continental Shelf, Geological Survey Circular 720, p. 2 (1975). The first offshore well drilled from a mobile platform, the dominant technology used today, located out of sight from land was drilled 12 miles from the Louisiana coast in 1947. *Ibid.* In its proffer of evidence, the State of Louisiana estimated that there exist over 13,000 wells operating in OCS lands in the Gulf of Mexico. See Proffer of Proof of Louisiana to Special Master 8. According to one source, 948 offshore wells were drilled off the coast of Louisiana in 1978. Braunstein & Allen, Developments in Louisiana Gulf Coast Offshore in 1978, 63 AAPG Bull. 1310 (Aug. 1979).

[2] In 1970, South Louisiana, an area including both the onshore and offshore area adjacent to Louisiana, was responsible for the production of approximately 33% of domestic natural gas production. See Federal Power Comm'n, Bureau of Natural Gas, National Gas Supply and Demand, 1971–1990, Staff Rep. No. 2, pp. 20–22 (1972) ; J. Schanz & H. Frank, Natural Gas in the Future National Energy Pattern, in Regulation of the Natural Gas Producing Industry 18–19 (K. Brown ed. 1972). As of 1973, over 25 trillion cubic feet of natural gas had been produced from Louisiana's offshore lands, with approximately 77% coming from federal OCS areas. Geological Survey Circular 720, *supra*, at 28 (Table 13). It has been estimated that the present reserves in the offshore area adjacent to the Gulf States is approximately 38 trillion cubic feet of gas. J. Hewitt, J. Knipmeyer, & E. Schluntz, Estimated Oil and Gas Reserves, Gulf of Mexico Outer Continental Shelf (U. S. Dept. of Interior, Geological Survey, Dec. 31, 1979).

Louisiana.[3] The contractual arrangements between a producer of gas and the pipeline companies vary. Most often, the producer sells the gas to the pipeline companies at the wellhead, although the producer may retain an interest in any extractable components. Some producers, however, retain full ownership rights and simply pay a flat fee for the use of the pipeline companies' facilities.[4]

The ownership and control of these large reserves of natural gas have been much disputed. In *United States* v. *Louisiana,* 339 U. S. 699 (1950), the Court applied the principle of its holding in *United States* v. *California,* 332 U. S. 19 (1947)—that the United States possesses paramount rights to lands beneath the Pacific Ocean seaward of California's low-water mark—to the offshore areas adjacent to Louisiana. In 1953, Congress passed the Submerged Lands Act, 43 U. S. C. §§ 1301–1315, ceding any federal interest in the lands within three miles of the coast, while confirming the Federal Government's interest in the area seaward of the 3-mile limit.[5] See *United States* v. *Louisiana,* 363 U. S. 1 (1960); *United States* v. *Maine,* 420 U. S. 515, 524–526 (1975). In the same year, Congress passed the Outer Continental Shelf Lands Act, 43 U. S. C. §§ 1331–1343 (OCS Act), which declared that the "subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition . . . ." § 1322. The OCS Act also established procedures for federal leasing of OCS land to develop mineral resources. While the passage of these Acts established the

---

[3] See Proffer of Proof of Louisiana to Special Master 21 (Fact No. 43).

[4] See *id.,* at 11–13 (Facts Nos. 19–22).

[5] Representatives from the State of Louisiana, as well as from other Gulf States, appeared before Congress in support of a measure to provide the States with a share of any income from that part of the OCS abutting their respective States. See Hearings on S. 1901 before the Senate Committee on Interior and Insular Affairs, 83d Cong., 1st Sess., 185–186, 187–188, 191–193, 265–266 (1953).

respective legal interests of the parties, there has been extensive litigation to establish the legal boundaries of the federal OCS domain. See generally *United States* v. *Louisiana,* 446 U. S. 253, 254–260 (1980) (detailing the history of the "long-continuing and sometimes strained controversy" between the United States and Louisiana concerning the OCS lands).

In 1978, the Louisiana Legislature enacted a tax of seven cents per thousand cubic feet of natural gas [6] on the "first use" of any gas imported into Louisiana which was not previously subjected to taxation by another State or the United States. La. Rev. Stat. Ann. §§ 47:1301–47:1307 (West Supp. 1981) (Act). The Tax imposed is precisely equal to the severance tax the State imposes on Louisiana gas producers. The Tax is owed by the owner of the gas at the time the first taxable "use" occurs within Louisiana. § 1305B. About 85% of the OCS gas brought ashore is owned by the pipeline companies, the rest by the producers. Since most States impose their own severance tax, it is acknowledged that the primary effect of the First-Use Tax will be on gas produced in the federal OCS area and then piped to processing plants located within Louisiana. It has been estimated that Louisiana would receive at least $150 million in annual receipts from the First-Use Tax.[7]

---

[6] A thousand cubic feet of gas was defined, as is commonplace in the industry, as that amount of gas which occupies that volume at a temperature of 60 degrees Fahrenheit and 15.025 pounds per square inch of pressure absolute. La. Rev. Stat. Ann. § 47:1303 (B) (West Supp. 1981).

[7] Estimates of the annual revenues from the First-Use Tax have varied. The plaintiff States and the United States estimated the annual receipts to be $225 million, while the pipeline companies suggested $275 million. See also, Note, The Louisiana First-Use Tax: Does It Violate the Commerce Clause?, 53 Tulane L. Rev. 1474 (1979) ($170 million); First-Use Tax, 31 La. Coastal L. Rep. No. 31 (Oct. 1978) ($185 million in first year).

Part II of the First-Use Tax Act created the First-Use Trust Fund. Receipts of the Tax were to be placed in the fund and expended in accordance with the terms of the Act. La. Rev. Stat. Ann. § 47:1351 (West

The stated purpose of the First-Use Tax was to reimburse the people of Louisiana for damages to the State's waterbottoms, barrier islands, and coastal areas resulting from the introduction of natural gas into Louisiana from areas not subject to state taxes as well as to compensate for the costs incurred by the State in protecting those resources. § 1301C. Moreover, the Tax was designed to equalize competition between gas produced in Louisiana and subject to the state severance tax of seven cents per thousand cubic feet, and gas produced elsewhere not subject to a severance tax such as OCS gas. § 1301A. The Act specified a number of different uses justifying imposition of the First-Use Tax including sale, processing, transportation, use in manufacturing, treatment, or "other ascertainable action at a point within the state." § 1302 (8).[8]

The Act itself, as well as provisions found elsewhere in the state statutes, provided a number of exemptions from and credits for the First-Use Tax. The Severance Tax Credit provided that any taxpayer subject to the First-Use Tax was entitled to a direct tax credit on any Louisiana severance tax owed in connection with the extraction of natural resources within the State. La. Rev. Stat. Ann. § 47:647 (West Supp.

---

Supp. 1981). Specifically, the Act provided that 75% of the proceeds would go towards retirement of the general debt of the State. § 1351A (2). Also 25% of the proceeds were to be deposited in a Barrier Islands Conservation Account to be used to fund capital improvements for projects designed to "conserve, preserve, and maintain the barrier islands, reefs, and shores of the coastline of Louisiana." § 1351A (3).

[8] A taxable "use" was defined as:

"the sale; the transportation in the state to the point of delivery at the inlet of any processing plant; the transportation in the state of unprocessed natural gas to the point of delivery at the inlet of any measurement or storage facility; transfer of possession or relinquishment of control at a delivery point in the state; processing for the extraction of liquefiable component products or waste materials; use in manufacturing; treatment; or other ascertainable action at a point within the state." La. Rev. Stat. Ann. § 47:1302 (8) (West Supp. 1981).

1981).[9]  Second, municipal or state-regulated electric generating plants and natural gas distributing services located within Louisiana, as well as any direct purchaser of gas used for consumption directly by that purchaser, were provided tax credits on other Louisiana taxes upon a showing that "fuel costs for electricity generation or natural gas distribution or consumption have increased as a direct result of increases in transportation and marketing costs of natural gas delivered from the federal domain of the outer continental shelf . . . ," which implicitly includes any increases resulting from the First-Use Tax. La. Rev. Stat. Ann. § 47:11B (West Supp. 1981).[10]  Furthermore, imported natural gas used for drilling oil or gas within the State was exempted from the First-Use Tax. La. Rev. Stat. Ann. § 47:1303A (West Supp. 1981). Thus, Louisiana consumers of OCS gas for the most part are not burdened by the Tax, but it does uniformly apply to gas moving out of the State.  The Act also purported to establish the legal effect of the Tax in terms of defining the proper

---

[9] The Severance Tax Credit bill was passed at the same time as the First-Use Tax, and provides as follows:

"A. (1) Every taxpayer liable for and remitting taxes levied and collected pursuant to [the First-Use Tax] and each taxpayer who bears such taxes as a direct result of contractual terms or agreements applied in disregard of R. S. 47:1303 (C), shall be allowed a direct tax credit, at any time following payment of such tax, but, not in excess of the amount which must be borne by such taxpayer, against severance taxes owed by such taxpayer to the state, the amount of which credit shall not exceed the amount of severance taxes for which such taxpayer is liable to the state as a direct consequence of the privilege of severing natural resources from the surface of the soil or water of the state."

The tax credit also assigns the order in which the credit shall be applied depending on the type of severance credit paid.  The credit is first applied to oil severance taxes and lists in descending order the other resources subject to severance tax credit. § 647A (2).  The tax credit does not affect any severance taxes assessed by the local parishes.  § 647C.

[10] The statutory provision exempts from the tax credit provision any increases in wellhead price attributable to inflation.

allocation of the Tax among potentially liable parties. Specifically, the Act declared that the "tax shall be deemed a cost associated with uses made by the owner in preparation of marketing of the natural gas." § 1303C. Any contract which attempted to allocate the cost of the Tax to any party except the ultimate consumer was declared to be "against public policy and unenforceable to that extent." *Ibid.*

On March 29, 1979, eight States filed a motion for leave to file a complaint under this Court's original jurisdiction pursuant to Art. III, § 2, of the Constitution. The complaint sought a declaratory judgment that the First-Use Tax was unconstitutional under: (1) the Commerce Clause, Art. I, § 8, cl. 3; (2) the Supremacy Clause, Art. VI, cl. 2; (3) the Import-Export Clause, Art. I, § 10, cl. 2; (4) the Impairment of Contracts Clause, Art. I, § 10, cl. 1; and (5) the Equal Protection Clause of the Fourteenth Amendment. The plaintiff States also sought injunctive relief against Louisiana or its agents collecting the Tax with respect to any gas in interstate commerce as well as a refund of taxes already collected. We granted plaintiffs' motion for leave to file on June 18, 1979. 442 U. S. 937. Subsequently, as is usual, we appointed a Special Master to facilitate handling of the suit. 445 U. S. 913 (1980). To date, the Special Master has issued two reports. In the first report, dated May 14, 1980, the Special Master recommended that the Court approve the motions of New Jersey, the United States, the Federal Energy Regulatory Commission (FERC), and 17 pipeline companies to intervene as plaintiffs. The Master's second report was issued on September 15, 1980, and essentially made two recommendations. First, the Master recommended that we deny Louisiana's motion to dismiss and reject the submissions that the plaintiff States had no standing to bring the action and that the case was not an appropriate one for the exercise of our original jurisdiction. Second, on the plaintiff States' motion for judgment on the pleadings on the grounds that the Tax was unconstitutional on its face, the Special Master, while recog-

nizing that the statute was constitutionally suspect in certain respects, recommended that the motion be denied and that further evidentiary hearings be conducted. We heard oral argument on the exceptions filed to the reports.

## II

Initially, we must resolve Louisiana's contention, rejected by the Special Master, that the case should be dismissed. In support of its motion, Louisiana presents two principal arguments. First, Louisiana contends that the plaintiff States lack standing to bring the suit under the Court's original jurisdiction. Second, Louisiana argues that even if the bare requirements for exercise of our original jurisdiction have been met, this case is not an appropriate one to entertain here because of certain pending state-court actions in Louisiana in which the constitutional issues sought to be presented may be addressed. See *Arizona* v. *New Mexico,* 425 U. S. 794, 797 (1976). See also *Ohio* v. *Wyandotte Chemicals Corp.,* 401 U. S. 493, 501 (1971). We agree with the Special Master that both contentions should be rejected.

## A

### 1

The Constitution provides for this Court's original jurisdiction over cases in which a "State shall be a Party." Art. III, § 2, cl. 2. Congress has in turn provided that the Supreme Court shall have "original and exclusive jurisdiction of all controversies between two or more States." 28 U. S. C. § 1251 (a) (1976 ed., Supp. III). In order to constitute a proper "controversy" under our original jurisdiction, "it must appear that the complaining State has suffered a wrong through the action of the other State, furnishing ground for judicial redress, or is asserting a right against the other State which is susceptible of judicial enforcement according to the accepted principles of the common law or equity systems of

jurisprudence." *Massachusetts* v. *Missouri,* 308 U. S. 1, 15 (1939). See *New York* v. *Illinois,* 274 U. S. 488, 490 (1927); *Texas* v. *Florida,* 306 U. S. 398, 405 (1939).[11]

Louisiana asserts that this case should be dismissed for want of standing because the Tax is imposed on the pipeline companies and not directly on the ultimate consumers. Under its view, the alleged interests of the plaintiff States do not fall within the type of "sovereignty" concerns justifying exercise of our original jurisdiction. Standing to sue, however, exists for constitutional purposes if the injury alleged "fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon* v. *Eastern Kentucky Welfare Rights Organization,* 426 U. S. 26, 41–42 (1976). See *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S. 59, 72–81 (1978). This is clearly the case here. The plaintiff States are substantial consumers of natural gas.[12] The First-Use Tax, while imposed on the pipeline companies, is clearly intended to be passed on to the ultimate consumer. Indeed, the statute forbids the Tax from being passed on or back to any third party other than the purchaser of the gas and explicitly directs that it should be considered as a cost of preparing the gas for market. La. Rev. Stat. Ann. § 47:1303C (West Supp.

---

[11] See generally *New York* v. *New Jersey,* 256 U. S. 296, 309 (1921) ("Before this court can be moved to exercise its extraordinary power under the Constitution to control the conduct of one State at the suit of another, the threatened invasion of rights must be of serious magnitude and it must be established by clear and convincing evidence").

[12] As alleged in the complaint, the annual increase in natural gas costs directly associated with the First-Use Tax with respect to each of the plaintiff States is as follows: Maryland ($60,000); New York ($300,000); Massachusetts ($25,000); Rhode Island ($25,000); Illinois ($270,000); Indiana ($70,000); Michigan ($650,000); Wisconsin ($70,000); New Jersey ($20,000). See Complaint, at 12–16. Total direct injuries to the plaintiff States was estimated to be $1.5 million, and injury to the citizen consumers was estimated at $120 million. *Id.,* at 16.

1981). In fact, the pipeline companies, with the approval of the FERC, have passed on the cost of the First-Use Tax to their customers. See *Louisiana First-Use Tax in Pipeline Rate Cases,* Docket No. RM78–23, Order No. 10, 43 Fed. Reg. 45553 (1978).[13] Thus, the Special Master properly determined that "although the tax is collected from the pipelines, it is really a burden on consumers." Second Report, at 12. It is clear that the plaintiff States, as major purchasers of natural gas whose cost has increased as a direct result of Louisiana's imposition of the First-Use Tax, are directly affected in a "substantial and real" way so as to justify their exercise of this Court's original jurisdiction.

2

Jurisdiction is also supported by the States' interest as *parens patriae.* A State is not permitted to enter a controversy as a nominal party in order to forward the claims of individual citizens. See *Oklahoma ex rel. Johnson* v. *Cook,* 304 U. S. 387 (1938); *New Hampshire* v. *Louisiana,* 108 U. S. 76 (1883). But it may act as the representative of its citizens in original actions where the injury alleged affects the general population of a State in a substantial way. See, *e. g., Missouri* v. *Illinois,* 180 U. S. 208 (1901); *Kansas* v. *Colorado,* 185 U. S. 125 (1902); *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230 (1907). See generally Note, The Original Jurisdiction of the United States Supreme Court, 11 Stan. L.

---

[13] In approving the pass-through, the FERC did not accept the constitutionality of the First-Use Tax; FERC has consistently taken the position that the Tax is unconstitutional. Moreover, approval of the pass-through was expressly conditioned on the pipeline companies' taking legal action to determine the legality of the Tax, and to provide for refund to the customers should it be declared unconstitutional. Administrative proceedings before the FERC are continuing, and the agency has issued an order to show cause why the gas producers should not be required to pay the portion of the First-Use Tax relating to liquid or liquefiable hydrocarbons transported with or extracted from the gas subject to the Tax.

Rev. 665, 671–678 (1959).    Cf. *Hawaii* v. *Standard Oil Co.*, 405 U. S. 251, 257–259 (1972) (the Court has recognized the right of a State to sue as *parens patriae* "to prevent or repair harm to its 'quasi-sovereign' interests" in original jurisdiction suits).

In this respect, this case is functionally indistinguishable from *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923), in which the Court entertained a suit brought by one State against another.   In that case, West Virginia, then the leading producer of natural gas, required gas producers in the State to meet the needs of all local customers before shipping any gas interstate.   Ohio and Pennsylvania moved for leave to file a complaint under the Court's original jurisdiction claiming that the statute violated the Commerce Clause in that the statute would have the effect of cutting off supplies of natural gas to those States.   Both States claimed to be protecting a twofold interest—"one as the proprietor of various public institutions and schools whose supply of gas will be largely curtailed or cut off by the threatened interference with the interstate current, and the other as the representative of the consuming public whose supply will be similarly affected."   The Court granted leave to file, finding both interests to be substantial.   With respect to representing the interests of its citizens the Court stated:

> "The private consumers in each State not only include most of the inhabitants of many urban communities but constitute a substantial portion of the State's population.   Their health, comfort and welfare are seriously jeopardized by the threatened withdrawal of the gas from the interstate stream.   This is a matter of grave public concern in which the State, as the representative of the public, has an interest apart from that of the individuals affected.   It is not merely a remote or ethical interest but one which is immediate and recognized by law." *Id.*, at 592.

*Pennsylvania* v. *West Virginia* counsels that we should not dismiss this action. Plaintiff States have alleged substantial and serious injury to their proprietary interests as consumers of natural gas as a direct result of the allegedly unconstitutional actions of Louisiana. This direct injury is also supported by the States' interest in protecting its citizens from substantial economic injury presented by imposition of the First-Use Tax. Nor does the incidence of the Tax fall on a small group of citizens who are likely to challenge the Tax directly. Rather, a great many citizens in each of the plaintiff States are themselves consumers of natural gas and are faced with increased costs aggregating millions of dollars per year. As the Special Master observed, individual consumers cannot be expected to litigate the validity of the First-Use Tax given that the amounts paid by each consumer are likely to be relatively small. Moreover, because the consumers are not directly responsible to Louisiana for payment of the taxes, they of course are foreclosed from suing for a refund in Louisiana's courts. In such circumstances, exercise of our original jurisdiction is proper.

## B

With respect to Louisiana's second argument, it is true that we have construed the congressional grant of exclusive jurisdiction under § 1251 (a) as requiring resort to our obligatory jurisdiction only in "appropriate cases." *Illinois* v. *City of Milwaukee,* 406 U. S. 91, 93 (1972); *Arizona* v. *New Mexico,* 425 U. S., at 796–797. This view is consistent with the general observation that the Court's original jurisdiction should be exercised "sparingly." *United States* v. *Nevada,* 412 U. S. 534, 538 (1973). See *Ohio* v. *Wyandotte Chemicals Corp.,* 401 U. S., at 501; *Massachusetts* v. *Missouri,* 308 U. S., at 18–20.[14] In *City of Milwaukee,* we noted that what is

---

[14] In *Ohio* v. *Wyandotte Chemicals Corp.,* 401 U. S., at 497, the Court noted that "[a]s our social system has grown more complex, the States

"appropriate" involves not only "the seriousness and dignity of the claim," but also "the availability of another forum where there is jurisdiction over the named parties, where the issues tendered may be litigated, and where appropriate relief may be had." 406 U. S., at 93. Louisiana urges that presently pending state lawsuits raising the identical constitutional issues presented here constitute sufficient reason to forgo the exercise of our original jurisdiction.

There have been filed in various lower courts several suits challenging the constitutionality of the First-Use Tax. The first suit was brought by Louisiana in state court seeking a declaratory judgment that the First-Use Tax is constitutional. *Edwards* v. *Transcontinental Gas Pipe Line Corp.,* No. 216,867 (19th Judicial Dist., East Baton Rouge Parish). Among the named defendants were all of the pipeline companies doing business in the State. The pipeline companies sought to have the Tax declared unconstitutional.[15] Other lawsuits were filed in state court seeking a refund of taxes paid under protest. *Southern Natural Gas Co.* v. *McNamara,* No. 225,533 (19th Judicial District, East Baton Rouge Parish). These refund actions were filed after this Court granted plaintiff States' motion for leave to file their complaint.[16]

---

have increasingly become enmeshed in a multitude of disputes with persons living outside their borders. Consider, for example, the frequency with which States and nonresidents clash over the application of state laws concerning taxes, motor vehicles, decedents' estates, business torts, government contracts, and so forth. It would, indeed, be anomalous were this Court to be held out as a potential principal forum for settling such controversies."

[15] The pipeline companies removed the case to federal court. Louisiana's motion to remand was granted, essentially on the ground that the intervention of the Federal District Court would be contrary to the provisions of the Tax Injunction Act, 28 U. S. C. § 1341. *Edwards* v. *Transcontinental Gas Pipe Line Corp.,* 464 F. Supp. 654 (MD La. 1979).

[16] By granting plaintiffs' motions for leave to file, we rejected Louisiana's motions that the case should be dismissed. Moreover, when we referred the case to the Special Master we expressly referred to him all

Since under Louisiana law there is no provision for interim injunctive relief, the pipeline companies were required to pay the Tax. The receipts have been put in an escrow account subject to refund with interest paid on the account at the rate of 6%. Neither the plaintiff States, the United States, nor the FERC is a named party in any of the state actions nor have they filed leave to intervene, although Louisiana represented at oral argument that such a motion would not be opposed.[17] The final suit was commenced by the FERC against various state officials, seeking to enjoin enforcement of the First-Use Tax on constitutional grounds. *FERC* v. *McNamara,* No. C. A. 78–384 (MD La.). That action is presently stayed.

In *City of Milwaukee,* on which Louisiana relies, the proposed suit by Illinois against four municipalities did not fall within our exclusive grant of original jurisdiction because political subdivisions of the State could not be considered as a State for purposes of 28 U. S. C. § 1251 (a) (1976 ed., Supp. III). 406 U. S., at 94–98. Similarly, the decision in *Wyandotte Chemicals* did not involve § 1251 (a), since it was a suit between a State and citizens of another State and so did not fall under our exclusive jurisdiction. Louisiana also relies,

---

pending motions *except* for Louisiana's motion to dismiss. See 445 U. S. 913 (1980). Usually, when we decline to exercise our original jurisdiction, we do so by denying the motion for leave to file. See *Arizona* v. *New Mexico,* 425 U. S. 794 (1976). Although it is arguable that the Special Master was not empowered to consider Louisiana's motion since we did not refer the question to him, we nonetheless rely on his report in light of the fact that we must consider Louisiana's motion to dismiss on the merits in any event, and because the matter went forward before the Special Master on the assumption that the motion to dismiss had been referred. Accordingly, we now see no reason not to acquiesce in the Special Master's views that the issues were properly before him.

[17] See Tr. of Oral Arg. 55–58. It is acknowledged that but for the "invitation" there exists no procedural mechanism in Louisiana for the plaintiff States or the United States to be made parties to the state refund suit.

however, on *Arizona* v. *New Mexico* for an example of a case where we determined not to exercise our exclusive jurisdiction in a case between States because the matter was "inappropriate" for determination.[18]

In that case, we denied Arizona's motion for leave to file a complaint against New Mexico. Arizona was suing to challenge New Mexico's electrical energy tax which imposed a net kilowatt hour tax on any electric utility generating electricity in New Mexico. Arizona sought a declaratory judgment that the tax constituted, *inter alia,* an unconstitutional discrimination against interstate commerce. Arizona brought the suit in its proprietary capacity as a consumer of electricity generated in New Mexico and as *parens patriae* for its citizens. Arizona further alleged that it had no other forum in which to vindicate its interests. New Mexico asserted that the three Arizona utilities affected by the statute had chosen not to pay the tax and instead had jointly filed suit in state court seeking a declaratory judgment that the tax was unconstitutional. This Court held that "[i]n the circumstances of this case, we are persuaded that the pending state-court action provides an appropriate forum in which the *issues* ten-

---

[18] In *Pennsylvania* v. *New Jersey,* 426 U. S. 660 (1976), we denied leave to file to a number of States challenging commuter income tax provisions adopted by certain other States. That case, however, clearly has no applicability to the present action. In *Pennsylvania,* the only reason that the complaining States were denied tax revenues was because their legislatures had determined to give a credit for taxes paid to other States, and, to this extent, any injury was voluntarily suffered. *Id.,* at 664. Moreover, jurisdiction was not proper under the *parens patriae* doctrine since the claims represented the aggregation of individual claims for wrongfully paid taxes which the individual commuter taxpayers were able to contest. *Id.,* at 665–666. See generally *Massachusetts* v. *Missouri,* 308 U. S. 1, 19–20 (1939). In this case, the plaintiff States are not responsible in any way for the economic impact of the Tax. Moreover, unlike the situation in *Pennsylvania,* individual citizens have no forum in which to challenge the Tax because they did not directly pay the Tax and are not entitled to bring refund actions in Louisiana.

dered here may be litigated." 425 U. S., at 797 (emphasis in original).

Of course, the issue of appropriateness in an original action between States must be determined on a case-by-case basis. Despite the facial similarity with *Arizona* v. *New Mexico,* there are significant differences from the present case that compel an opposite result. First, one of the three electric companies involved in the state-court action in New Mexico was a political subdivision of the State of Arizona. Arizona's interests were thus actually being represented by one of the named parties to the suit. In this case, none of the plaintiff States is directly represented in the tax refund case.[19] It is also important to note that Arizona had itself not suffered any direct harm as of the time that it moved for leave to file a complaint since none of the utilities had yet paid the tax. Unlike the present case, it was highly uncertain whether Arizona's interest as a purchaser of electricity had been adversely affected.[20] New Mexico's procedure did not limit the utility companies to seeking a refund of taxes already paid, but rather permitted the companies to refuse to pay the tax pending a declaration of the statute's constitutionality. In contrast, Louisiana requires the Tax to be paid pending the refund action with interest accruing at the rate of 6%. As recognized by the Special Master, the effect of the limited interest rate is to permit Louisiana to benefit from any delay attendant to the state-court proceedings even if the Tax is ultimately found unconstitutional.

The tax at issue in the *Arizona* case did not sufficiently implicate the unique concerns of federalism forming the basis of our original jurisdiction. At most, the New Mexico tax

---

[19] Despite the fact that these parties have been invited to intervene, see n. 17, *supra,* the Louisiana refund action is an imperfect forum, primarily because no injunctive relief prior to the determination on the merits is possible under Louisiana law. See La. Rev. Stat. Ann. §§ 47:1575, 47:1576 (West 1970 and Supp. 1981).

[20] See 425 U. S., at 798 (STEVENS, J., concurring).

affected only some residents in one State. In the present case, the magnitude and effect of the First-Use Tax is far greater. The anticipated $150-million yearly tax is intended to be and is being passed on to millions of consumers in over 30 States. Unlike the day-to-day taxing measures which spurred the Court's observations in *Wyandotte,* it is not at all a "waste" of this Court's time to consider the validity of a tax with the structure and effect of Louisiana's First-Use Tax. Indeed, there is nothing ordinary about the Tax. Given the underlying claim that Louisiana is attempting, in effect, to levy the Tax as a substitute for a severance tax on gas extracted from areas that belong to the people at large to the relative detriment of the other States in the Union, it is clear that the First-Use Tax implicates serious and important concerns of federalism fully in accord with the purposes and reach of our original jurisdiction.

The exercise of our original jurisdiction is also supported by the fact that the First-Use Tax affects the United States' interests in the administration of the OCS—a factor totally absent in *Arizona* v. *New Mexico.* While we do not have exclusive jurisdiction in suits brought by the United States against a State, see 28 U. S. C. § 1251 (b)(2) (1976 ed., Supp. III), we may entertain such suits as original actions in appropriate circumstances. See, *e. g., United States* v. *California,* 332 U. S. 19 (1947). See also *United States* v. *Alaska,* 422 U. S. 184, 186, n. 2 (1975). To be sure, we "seek to exercise our original jurisdiction sparingly and are particularly reluctant to take jurisdiction of a suit where the plaintiff has another adequate forum in which to settle his claim." *United States* v. *Nevada,* 412 U. S., at 538. In this case, however, it is clear that a district court action brought by the United States, which necessarily would not include the plaintiff States, would be an inadequate forum in light of the present posture of this case. In addition, because of the interest of the United States in protecting its rights in the OCS area, with ramifications for all coastal States, as well

as its interests under the regulatory mechanism that supervises the production and development of natural gas resources, we believe that this case is an appropriate one for the exercise of our original jurisdiction under § 1251 (b)(2).

For the reasons stated above, we reject Louisiana's exceptions to the report of the Special Master, and accept the recommendation that we deny Louisiana's motion to dismiss.[21]

---

[21] We note in passing that Louisiana's other arguments against the exercise of our original jurisdiction are lacking in merit. First, our original jurisdiction is not affected by the provisions of the Eleventh Amendment which only withholds federal judicial power in suits against a State "by Citizens of another State, or by Citizens or Subjects of any Foreign State." Thus, an original action between two States only violates the Eleventh Amendment if the plaintiff State is actually suing to recover for injuries to specific individuals. *Hawaii* v. *Standard Oil Co.*, 405 U. S. 251, 258–259, n. 12 (1972). Second, the Tax Injunction Act, which by its terms only applies to injunctions issued by federal district courts, 28 U. S. C. § 1341, is inapplicable in original actions. We thus reject Louisiana's exceptions based on these grounds.

Louisiana also excepted to each of the recommendations made by the Special Master in his first report concerning various preliminary matters. Given the above determination on Louisiana's motion to dismiss, we reject each of Louisiana's exceptions and adopt the recommendations contained in the Special Master's first report. Specifically, we agree that New Jersey, whose allegations of injury are identical to that of the original plaintiff States, clearly has standing and should be permitted to intervene. Second, we believe that the United States' interests in the operation of the OCS Act and the FERC's interests in the operation of the Natural Gas Act are sufficiently important to warrant their intervention as party plaintiffs, see *supra*, at 744 and this page. We have often permitted the United States to intervene in appropriate cases where distinctively federal interests, best presented by the United States itself, are at stake. See, *e. g., Arizona* v. *California*, 344 U. S. 919 (1953); *Oklahoma* v. *Texas*, 253 U. S. 465 (1920). Third, the Master recommended that we grant the motion of 17 pipeline companies to intervene as plaintiffs. Given that the Tax is directly imposed on the owner of imported gas and that the pipelines most often own the gas, those companies have a direct stake in this controversy and in the interest of a full exposition of the issues, we accept the Special Master's recommendation that the pipeline companies be permitted to intervene, noting that it is not unusual to per-

## III

On the merits, plaintiffs argue that the First-Use Tax violates the Supremacy Clause because it interferes with federal regulation of the transportation and sale of natural gas in interstate commerce. The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. It is basic to this constitutional command that all conflicting state provisions be without effect. See *McCulloch* v. *Maryland*, 4 Wheat. 316, 427 (1819). See also *Hines* v. *Davidowitz*, 312 U. S. 52 (1941). Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law. See *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). But as the Court stated in *Rice:*

> "Such a purpose [to displace state law] may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. *Pennsylvania R. Co.* v. *Public Service Comm'n*, 250 U. S. 566, 569; *Cloverleaf Butter Co.* v. *Patterson*, 315 U. S. 148. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. *Hines* v. *Davidowitz*, 312 U. S. 52. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. *Southern R. Co.* v. *Railroad Commission*, 236 U. S. 439; *Charleston*

mit intervention of private parties in original actions. See *Oklahoma* v. *Texas*, 258 U. S. 574 (1922). Cf. *Trbovich* v. *Mine Workers*, 404 U. S. 528, 536–539 (1972). Finally, we agree with the Special Master that the Associated Gas Distributors should be permitted to file an *amicus* brief.

& *W. C. R. Co.* v. *Varnville Co.*, 237 U. S. 597; *New York Central R. Co.* v. *Winfield*, 244 U S. 147; *Napier* v. *Atlantic Coast Line R. Co.*, [272 U. S. 605]. Or the state policy may produce a result inconsistent with the objective of the federal statute. *Hill* v. *Florida*, 325 U. S. 538." *Ibid.*

Of course, a state statute is void to the extent it conflicts with a federal statute—if, for example, "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or where the law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, *supra*, at 67. See generally *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151, 157–158 (1978); *City of Burbank* v. *Lockheed Air Terminal, Inc.*, 411 U. S. 624, 633 (1973).

Plaintiffs argue that § 1303C of the Act violates the Natural Gas Act, 15 U. S. C. §§ 717–717w (1976 ed. and Supp. III) (Gas Act), as amended by the Natural Gas Policy Act of 1978.[22] In 1938, Congress enacted the Gas Act to assure

---

[22] The Natural Gas Policy Act of 1978 was enacted to alleviate the adverse economic effects of the disparate treatment of intrastate and interstate natural gas sales. Under 15 U. S. C. § 3320 (1976 ed., Supp. III), a price for the first sale of gas shall not be considered to exceed the maximum lawful price if it is necessary to recover "any costs of compressing, gathering, processing, treating, liquefying, or transporting such natural gas, or other similar costs, borne by the seller and allowed for, by rule or order, by the Commission."

Plaintiffs also argue that the entire scheme of taxation in Louisiana with its series of tax credits and exemptions, see text, *infra*, at 756–758, necessarily interferes with the FERC's comprehensive authority to regulate the price of gas. The Special Master determined that the decision was difficult to make given the fact that the FERC had permitted the cost to be passed on. The Special Master concluded that it may ultimately be decided that some of the costs are beyond the reach of the FERC, or that the Tax is not a "substantial hindrance" to the Commission. We do not need to reach plaintiffs' exception on this point given our resolution on the other issues presented.

that consumers of natural gas receive a fair price and also to protect against the economic power of the interstate pipelines. See *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591, 610, 612 (1944); *Atlantic Refining Co.* v. *Public Service Comm'n of New York*, 360 U. S. 378, 388–389 (1959). The Gas Act was intended to provide the Federal Power Commission, now the FERC, with authority to regulate the wholesale pricing of natural gas in the flow of interstate commerce from wellhead to delivery to consumers. *Phillips Petroleum Co.* v. *Wisconsin*, 347 U. S. 672, 682 (1954).

Under the present law, natural gas owners are entitled to recover from their customers all legitimate costs associated with the production, processing, and transportation of natural gas. See *FPC* v. *United Gas Pipe Line Co.*, 386 U. S. 237, 243 (1967) (cost of service normally includes proper allowance for taxes and this allowance is "obviously within the jurisdiction of the Commission"). As part of the First-Use Tax, Louisiana has directed that the amount of the Tax should be "deemed a cost associated with uses made by the owner in preparation of marketing of the natural gas." § 1303C.[23]

---

[23] Section 1303C provides:

"[The First-Use Tax] shall be deemed a cost associated with uses made by the owner in preparation of marketing of the natural gas. Any agreement or contract by which an owner of natural gas at the time a taxable use first occurs claims a right to reimbursement or refund of such taxes from any other party in interest, other than a purchaser of such natural gas, is hereby declared to be against public policy and unenforceable to that extent. Notwithstanding any such agreement or contract, such an owner shall not have an enforceable right to any reimbursement or refund on the basis that this tax constitutes a cost incurred by such owner by virtue of the separation or processing of natural gas for extraction of liquid or liquefiable hydrocarbons, or that this tax constitutes any other grounds for reimbursement or refund under such agreement or contract, unless there has been a final and unappealable judicial determination that such owner is entitled to such reimbursement or refund, notwithstanding the public policy and purpose of this part and the foregoing provisions of this

The Act further provides that an owner shall not have an enforceable right to seek reimbursement for payment of the Tax from any third party other than a purchaser of the gas, *ibid.*, even though the third party may be the owner of marketable hydrocarbons that are extracted from the gas in the course of processing.

The effect of § 1303C is to interfere with the FERC's authority to regulate the determination of the proper allocation of costs associated with the sale of natural gas to consumers. The unprocessed gas obtained at the wellhead contains extractable hydrocarbons which are most often owned and sold separately from the "dried" gas. The FERC normally allocates part of the processing costs between these related products, and insists that the owners of the liquefiable hydrocarbons bear a fair share of the expense associated with processing.[24] See generally *FPC* v. *United Gas Pipe Line Co., supra,* at 243 ("income and expense of unregulated and regulated activities should be segregated"). By specifying that the First-Use Tax is a processing cost to be either borne by the pipeline or other owner without compensation, an unlikely event in light of the large sums involved, or passed on to purchasers, Louisiana has attempted a substantial usurpation of the authority of the FERC by dictating to the pipelines the allocation of processing costs for the interstate ship-

Subsection C. In any legal action pursuant to this Subsection, the state shall be an indispensable party in interest."

[24] See *Mobil Oil Corp.* v. *FPC,* 157 U. S. App. D. C. 235, 238–240, 483 F. 2d 1238, 1241–1243 (1973); *Detroit* v. *FPC,* 97 U. S. App. D. C. 260, 269–271, 230 F. 2d 810, 819–821 (1955), cert. denied, 352 U. S. 829 (1956); *Union Oil Company of California,* Docket No. CI77–828 et al., p. 11 (FERC, Apr. 12, 1978); *Canadian Superior Oil (U. S.) Ltd.,* Docket No. CI77–802 et al., p. 4 (FERC, Mar. 28, 1978); *Tennessee Gas Pipeline Co.,* 38 F. P. C. 691, 698 (1967); *Continental Oil Co.,* 27 F. P. C. 96, 107–108 (1962). Removal reduces both the volume and heat content of the natural gas ultimately received by the gas consumers. See *Area Rate Proceeding,* 40 F. P. C. 530, 611 (1968), aff'd, 428 F. 2d 407 (CA5), cert. denied, 400 U. S. 950 (1970).

ment of natural gas. Owners of natural gas are foreclosed by the operation of § 1303C from entering into valid contracts requiring the owners of the extracted hydrocarbons to reimburse the pipelines for costs associated with transporting and processing these products. The effect of § 1303C is to shift the incidence of certain expenses, which the FERC insists are incurred substantially for the benefit of the owners of extractable hydrocarbons, to the ultimate consumer of the processed gas without the prior approval of the FERC.

The effect of § 1303C is akin to the state regulation overturned in *Northern Natural Gas Co.* v. *State Corporation Comm'n of Kansas,* 372 U. S. 84, 92 (1963). In *Northern Natural Gas,* a state administrative agency's rule required an interstate pipeline company to purchase natural gas ratably from all the wells in a particular field. The Court held that the rule violated the superior interests of the Federal Government under the Gas Act. The state Commission's order shifted the burden of performing the "complex task of balancing the output of thousands of natural gas wells within the State" to the pipeline company. This requirement "could seriously impair the Federal Commission's authority to regulate the intricate relationship between the purchasers' cost structures and eventual costs to wholesale customers who sell to consumers in other States. This relationship is a matter with respect to which Congress has given the Federal Power Commission paramount and exclusive authority." *Ibid.*

While the Special Master noted that the FERC was of the opinion that the First-Use Tax was impermissible, the Special Master refused to recommend that the Court grant plaintiffs' motion for judgment on the Supremacy Clause issue respecting § 1303C because he discerned a factual issue concerning the nature of the gas-drying process. Under the Special Master's view, if the facts demonstrated that processing was done for the profit of the owners of the extractable hydrocarbons, then the position of the FERC that such costs

should not be passed on to the consumers was correct. If, however, the processing·was done as a means of standardizing the heat content of the gas for sale to consumers, then it would be reasonable to pass the Tax forward, and thus § 1303C would be consistent with Gas Act policy. The Special Master concluded that this question was best resolved after suitable factual development, and that in any event, it may be that "in the end FERC's orders can be adjusted so that the laws will mesh without conflict."

It is our view, however, that the issue is ripe for decision without further evidentiary hearings. Under the Gas Act, determining pipeline and producer costs is the task of the FERC in the first instance, subject to judicial review. Hence, the further hearings contemplated by the Special Master to determine whether and how processing costs are to be allocated are as inappropriate as Louisiana's effort to pre-empt those decisions by a statute directing that processing costs be passed on to the consumer. Even if the FERC ultimately determined that such expenses should be passed on *in toto,* this kind of decisionmaking is within the jurisdiction of the FERC; and the Louisiana statute, like the state Commission's order in *Northern Natural Gas, supra,* is inconsistent with the federal scheme and must give way. At the very least, there is an "imminent possibility of collision," *ibid.*[25] The FERC need not adjust its ruling to accommodate the Louisiana statute. To the contrary, the State may not trespass on the authority of the federal agency. As we see it, plaintiffs are entitled to judgment on the pleadings that

---

[25] It is no answer to note that the FERC has administratively determined that the Tax may be passed on. The agency's position is that the Tax is unconstitutional as an invasion of its authority; and as a condition for permitting the pipeline companies to pass the Tax through to consumers, has required that the companies "undertak[e] all legal action . . . to determine the constitutionality of the tax," and secure means; for an effective refund should any taxes paid be returned upon a final finding that the Tax was unconstitutional. 43 Fed. Reg. 45553 (1978).

§ 1303C is invalid under the Supremacy Clause. To that extent, therefore, we sustain plaintiffs' exceptions to the Special Master's second report.[26]

---

[26] The United States argues that once § 1303C is found unconstitutional the entire Act falls under § 4 of the Act which provides that in the event of a "final and unappealable judicial decision" upholding the right of any owner to "enforce a contract or agreement otherwise rendered unenforceable by R. S. 47:1303 (C)," the following consequences would occur:

"(2) If the right upheld arises from the provisions of a contract or agreement requiring any other party to reimburse or refund to an owner costs or expenses incurred by such owner by virtue of separation or processing of natural gas for extraction of liquid or liquefiable hydrocarbons, then this Act shall be null and void and the secretary shall forthwith return tò each taxpayer all taxes previously paid, together with interest at the rate of six percent per annum from the date of payment."

Since a specific contractual provision is not involved here, the precise terms of the Louisiana statute are not met despite the fact that a final and unappealable determination of the unconstitutionality of § 1303C has been made. Accordingly, we are not in position, based on the provision contained in § 4, to determine that the entire Act is null and void.

Plaintiff States, as well as the pipeline companies, also press another Supremacy Clause issue, contending that the First-Use Tax is inconsistent with the OCS Act, 43 U. S. C. §§ 1331–1356 (1976 ed. and Supp. III). Under § 1332, it is declared to be the policy of the United States that "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this subchapter." Section 1333 (a) (1) expressly extends the Constitution and laws of the United States to the subsoil and seabed of the shelf. While the Act borrows "applicable and not inconsistent" state laws for certain purposes, such as were necessary to fill gaps in federal law, see *Rodrigue* v. *Aetna Casualty & Surety Co.*, 395 U. S. 352, 355–359 (1969), it expressly declares that "[s]tate taxation laws shall not apply to the outer Continental Shelf." § 1333 (a) (2) (A). Moreover, the OCS Act provides that the provision for adopting state law "shall never be interpreted as a basis for claiming any interest in or jurisdiction on behalf of any State for any purpose over the seabed and subsoil of the outer Continental Shelf, or the property and natural resources thereof or the revenues therefrom." § 1333 (a) (3). By passing the OCS Act, Congress "emphatically implemented its view that the United States has para-

## IV

Plaintiffs also argue that the First-Use Tax violates the Commerce Clause of the United States Constitution which provides that "[t]he Congress shall have Power . . . [t]o

mount rights to the seabed beyond the three-mile limit . . . ." *United States* v. *Maine*, 420 U. S. 515, 526 (1975).

Plaintiff States contend that despite the fact that the First-Use statute declares that it is not taxing the gas itself and thus is not a state-imposed severance tax on OCS production, the inevitable intent and result of the Act is to impose a tax on the OCS production in contravention of the express prohibition of the OCS Act. It is clear that a State has no valid interest in imposing a severance tax on federal OCS land. In part, Louisiana purports to justify the Tax as a means of alleviating the alleged discrimination against Louisiana gas caused by the fact that Louisiana gas must pay the state severance tax while OCS gas does not. But if correcting the claimed imbalance were the sole justification asserted for the First-Use Tax, there would be grave doubt about the validity of the Tax. The proper fee or charge for drilling for gas on the OCS is a determination which is *solely* within the province of the Federal Government. Even if the United States were to decide to open up development to all comers at no charge in order to spur development of natural gas, Louisiana would have no interest in overriding that decision by imposing a tax to equalize the cost of local production with that on the federal OCS area. Permitting the States to exercise such power would adversely affect the price which the Government could command from private developers in their bid price. As clearly required by the OCS Act, Louisiana's sovereign interest in the development of offshore mineral interests stops at its 3-mile border. Louisiana, however, presses certain environmental interests as well in support of its First-Use Tax, and in light of this submission, we do not resolve the issue whether the Tax necessarily infringes on the sovereign interests of the United States in the OCS.

The intervening pipeline companies also argue that Louisiana has no valid environmental interest in imposing the First-Use Tax since the measure is pre-empted by the Coastal Zone Management Act of 1972, 86 Stat. 1280, as amended, 16 U. S. C. §§ 1451–1464 (1976 ed. and Supp. IV). The Coastal Zone Management Act provides federal funds to compensate States for environmental damage occurring as a result of offshore energy development to States which agree to comply with the standards mandated by the Act. The importance of the concerns for environmental damage are expressly recognized in the OCS Act. See 43 U. S. C. § 1332

regulate Commerce . . . among the several States . . . ." Art. I, § 8, cl. 3. Prior case law has established that a state tax is not *per se* invalid because it burdens interstate commerce since interstate commerce may constitutionally be made to pay its way. *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274 (1977). See *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250 (1938). The State's right to tax interstate commerce is limited, however, and no state tax may be sustained unless the tax: (1) has a substantial nexus with the State; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the State. *Washington Revenue Dept.* v. *Washington Stevedoring Assn.,* 435 U. S. 734, 750 (1978). One of the fundamental principles of Commerce. Clause jurisprudence is that no State, consistent with the Commerce Clause, may "impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to local business." *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450, 458 (1959). See *Boston Stock Exchange* v. *State Tax Comm'n,* 429 U. S. 318, 329 (1977). This antidiscrimination principle "follows inexorably from the basic purpose of the Clause" to prohibit the multiplication of preferential trade areas destructive of the free commerce anticipated by the Constitution. *Boston Stock Exchange, supra.* See *Dean Milk Co.* v. *Madison,* 340 U. S. 349, 356 (1951).

Initially, it is clear to us that the flow of gas from the OCS wells, through processing plants in Louisiana, and through interstate pipelines to the ultimate consumers in over 30 States constitutes interstate commerce. Louisiana argues that the taxable "uses" within the State break the flow of commerce and are wholly local events. But although the Louisiana "uses" may possess a sufficient local nexus to sup-

---

(4) (A) (1976 ed., Supp. III). We need not reach this contention in light of our disposition of the other claims, and to this extent the exceptions of the plaintiff States and the pipeline companies are overruled.

port otherwise valid taxation,[27] we do not agree that the flow of gas from the wellhead to the consumer, even though "interrupted" by certain events, is anything but a continual flow of gas in interstate commerce. Gas crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey. *California*

---

[27] The United States suggests that the uses enunciated in the Act do not have a sufficient local nexus to support the Tax under the Commerce Clause. See *Michigan-Wisconsin Pipe Line Co.* v. *Calvert*, 347 U. S. 157 (1954). While the local nexus of certain of the uses is suspect, other uses would appear to have a substantial local nexus so that on the present record it would be difficult to say that the entire Tax was unconstitutional on this ground. The Act contains a severability clause providing that if any use is found to be an unconstitutional basis for taxation, the next use would be taxed. See La. Rev. Stat. Ann. § 47:1303F (West Supp. 1981). Given our resolution on the discrimination charge, we find it unnecessary to reach the local nexus claim especially in light of the severability clause. To this extent, the exception of the United States and the FERC is overruled.

The United States and the plaintiff States also argue that the First-Use Tax is not fairly apportioned. To be valid, a tax on interstate commerce must be reasonably apportioned to the value of the activities occurring within the State upon which the Tax is imposed. See *Washington Revenue Dept.* v. *Washington Stevedoring Assn.*, 435 U. S. 734, 746–747 (1978). It is submitted that several factors suggest this principle is being violated. First, the Tax is imposed on each use as a function of the volume of the gas subject to the use, without attempting to tailor the amount of the Tax depending on the nature or extent of the actual use of the gas within Louisiana. Second, the use of the proceeds of the First-Use Tax demonstrates that the Tax is substantially in excess of the amount fairly associated with the local uses. Under the Act, 75% of the proceeds are used to service Louisiana's general debt, while only one-quarter is directly used to alleviate the alleged environmental damage caused by the pipeline activities. Third, the State has not demonstrated a sufficient relationship between other services provided by the State and the amount of the First-Use Taxes provided. In light of our determination that the Tax is discriminatory, however, we need not determine the apportionment issue. The exceptions of the United States, the FERC, and the plaintiff States to this extent are also overruled.

v. *Lo-Vaca Gathering Co.*, 379 U. S. 366, 369 (1965). See *Michigan-Wisconsin Pipe Line Co.* v. *Calvert*, 347 U. S. 157, 163 (1954); *FPC* v. *East Ohio Gas Co.*, 338 U. S. 464, 472–473 (1950); *Deep South Oil Co.* v. *FPC*, 247 F. 2d 882, 887–888 (CA5 1957). See generally *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.*, 314 U. S. 498, 503–504 (1942) (fact of sale does not serve to change the· "essential interstate nature of the business").

A state tax must be assessed in light of its actual effect considered in conjunction with other provisions of the State's tax scheme. "In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce." *Best & Co.* v. *Maxwell*, 311 U. S. 454, 455–456 (1940). See *Halliburton Oil Well Cementing Co.* v. *Reily*, 373 U. S. 64, 69 (1963); *Gregg Dyeing Co.* v. *Query*, 286 U. S. 472, 478–480 (1932). In this case, the Louisiana First-Use Tax unquestionably discriminates against interstate commerce in favor of local interests as the necessary result of various tax credits and exclusions. No further hearings are necessary to sustain this conclusion. Under the specific provisions of the First-Use Tax, OCS gas used for certain purposes within Louisiana is exempted from the Tax. OCS gas consumed in Louisiana for (1) producing oil, natural gas, or sulphur; (2) processing natural gas for the extraction of liquefiable hydrocarbons; or (3) manufacturing fertilizer and anhydrous ammonia, is exempt from the First-Use Tax. § 1303A. Competitive users in other States are burdened with the Tax. Other Louisiana statutes, enacted as part of the First-Use Tax package, provide important tax credits favoring local interests. Under the Severance Tax Credit, an owner paying the First-Use Tax on OCS gas receives an equivalent tax credit on any state severance tax owed in connection with production in Louisiana. § 47:647 (West Supp. 1981). On its face, this credit favors those who both own OCS gas and engage in

Louisiana production.[28] The obvious economic effect of this Severance Tax Credit is to encourage natural gas owners involved in the production of OCS gas to invest in mineral exploration and development within Louisiana rather than to invest in further OCS development or in production in other States. Finally, under the Louisiana statutes, any utility producing electricity with OCS gas, any natural gas distributor dealing in OCS gas, or any direct purchaser of OCS gas for consumption by the purchaser in Louisiana may recoup any increase in the cost of gas attributable to the First-Use Tax through credits against various taxes or a combination of taxes otherwise owed to the State of Louisiana. § 47:11B (West Supp. 1981). Louisiana consumers of OCS gas are thus substantially protected against the impact of the First-Use Tax and have the benefit of untaxed OCS gas which because it is not subject to either a severance tax or the First-Use Tax may be cheaper than locally produced gas. OCS gas

---

[28] The United States has provided an example which the Special Master used to illustrate the possible discrimination:

"This difference can be illustrated by the following example. Owner A has 1000 mcf of OCS gas; owner B has 500 mcf of OCS gas and 500 mcf of gas subject to Louisiana's severance tax. A owes $70 of first use tax; B owes $35 of first use tax and $35 in severance tax. B, however, pays only $35 in first use taxes. He owes no severance tax because he can credit the first use payment against the severance tax liability." Second Report, at 34, n. 18.

It has been observed that the credit means that "gas extracted offshore and gas extracted in Louisiana will be treated the same for Louisiana tax purposes only when the First Use Taxpayer has no severance tax liability to absorb the First Use Taxes." As a result, First-Use Taxpayers have an incentive to "undertake mineral extraction activities in Louisiana so as to minimize their effective First Use Tax burden and to compete on equal terms with other First Use Taxpayers whose First Use Tax burden has already been so minimized." W. Hellerstein, State Taxation in the Federal System: Perspectives on Louisiana's First Use Tax on Natural Gas, Shell Foundation Lecture at Tulane University School of Law (Nov. 20, 1980), pp. 23–24.

moving out of the State, however, is burdened with the First-Use Tax.[29]

The Special Master was aware that the effect of the Louisiana tax system is to favor local interests. With respect to the Severance Tax Credit, the Special Master noted that "[s]ince there is no apparent relation between the ownership of outer continental shelf gas and the production of gas in Louisiana, it is hard to understand Louisiana's motive in permitting this credit, but it obviously aids an intrastate operation in a way not available to a pipeline engaged only in interstate transportation or producing gas outside of Louisiana." Second Report, at 34. Moreover, the credit available to electrical generating plants, gas distributing services, and direct purchasers resulted in Louisiana customers being "protected in whole or in part from the incidence of the tax which is passed on to consumers out of the State." *Ibid.* Despite these concerns, the Special Master did not recommend granting plaintiffs' motion to invalidate the Tax under the Commerce Clause because, as he saw it, it was difficult to tell the effect of the various credits, given the totality of the operation of the state tax provisions. Thus, instead of being discriminatory, the "actuality of operation" test required by *Halliburton Oil Well Cementing Co.* v. *Reily, supra,* at 69, might demonstrate after a full hearing that the First-Use Tax is a proper " 'compensating' tax intended to complement the state severance tax as the use tax complemented the sales tax in *Henneford* v. *Silas Mason Co.,* 300 U. S. 577 (1937)." Second Report, at 35.

In our view, the First-Use Tax cannot be justified as a compensatory tax. The concept of a compensatory tax first requires identification of the burden for which the State is attempting to compensate. Here, Louisiana claims that the

---

[29] Of course, § 1303C itself may result in substantial discrimination since owners of gas subject to the state severance tax are not prohibited from allocating that cost to someone other than the ultimate consumer.

First-Use Tax compensates for the effect of the State's severance tax on local production of natural gas. To be sure, Louisiana has an interest in protecting its natural resources, and, like most States, has chosen to impose a severance tax on the privilege of severing resources from its soil. See *Bel Oil Corp.* v. *Roland,* 242 La. 498, 137 So. 2d 308, appeal dism'd, 371 U. S. 2 (1962); *Edwards* v. *Parker,* 332 So. 2d 175 (La. 1976). But the First-Use Tax is not designed to meet these same ends since Louisiana has no sovereign interest in being compensated for the severance of resources from the federally owned OCS land. The two events are not comparable in the same fashion as a use tax complements a sales tax. In that case, a State is attempting to impose a tax on a substantially equivalent event to assure uniform treatment of goods and materials to be consumed in the State. No such equality exists in this instance.

The common thread running through the cases upholding compensatory taxes is the equality of treatment between local and interstate commerce. See *Boston Stock Exchange,* 429 U. S., at 331–332; *Henneford* v. *Silas Mason Co.,* 300 U. S. 577, 583–584 (1937). See generally *Halliburton Oil,* 373 U. S., at 70 ("equal treatment for in-state and out-of-state taxpayers similarly situated is the condition precedent for a valid use tax on goods imported from out-of-state"). As already demonstrated, however, the pattern of credits and exemptions allowed under the Louisiana statute undeniably violates this principle of equality. As we have said, OCS gas may generally be consumed in Louisiana without the burden of the First-Use Tax. Its principal application is to gas moving out of the State. Of course, it does equalize the tax burdens on OCS gas leaving the State and Louisiana gas going into the interstate market. But this sort of equalization is not the kind of "compensating" effect that our cases have recognized.

It may be true that further hearings would be required to provide a precise determination of the extent of the discrim-

ination in this case, but this is an insufficient reason for not now declaring the Tax unconstitutional and eliminating the discrimination. We need not know how unequal the Tax is before concluding that it unconstitutionally discriminates. Accordingly, we grant plaintiffs' exception that the First-Use Tax is unconstitutional under the Commerce Clause because it unfairly discriminates against purchasers of gas moving through Louisiana in interstate commerce.

## V

In conclusion, we hold that § 1303C violates the Supremacy Clause and that the First-Use Tax is unconstitutional under the Commerce Clause. Judgment to that effect and enjoining further collection of the Tax shall be entered. Jurisdiction over the case is retained in the event that further proceedings are required to implement the judgment.

*So ordered.*

JUSTICE POWELL took no part in the consideration or decision of this case.

CHIEF JUSTICE BURGER, concurring.

There is much validity in JUSTICE REHNQUIST's dissenting opinion, and it should keep us alert to any effort to expand the use of our original jurisdiction. However, I am satisfied that the Court's resolution of this case is sound, and I therefore join the Court's opinion.

JUSTICE REHNQUIST, dissenting.

There is no question that this controversy falls within the literal terms of the constitutional and statutory grant of original jurisdiction to this Court. U. S. Const., Art. III, § 2, cl. 2; 28 U. S. C. § 1251 (a) (1976 ed., Supp. III). As the Court stated in *Illinois* v. *Milwaukee,* 406 U. S. 91, 93 (1972), however, "[w]e construe 28 U. S. C. § 1251 (a)(1), as we do

Art. III, § 2, cl. 2, to honor our original jurisdiction but to make it obligatory only in appropriate cases." Because of the nature of the interests which the plaintiff States seek to vindicate in this original action, and because of the existence of alternative forums in which these interests can be vindicated, I do not consider this an "appropriate case" for the exercise of original jurisdiction. The plaintiff States have not, in my view, established the "strictest necessity" required for invoking this Court's original jurisdiction, *Ohio* v. *Wyandotte Chemicals Corp.*, 401 U. S. 493, 505 (1971), and therefore I would grant defendant Louisiana's motion to dismiss the complaint.

## I

It has been a consistent and dominant theme in decisions of this Court that our original jurisdiction should be exercised with considerable restraint and only after searching inquiry into the necessity for doing so. As we noted in *Illinois* v. *Milwaukee,* "[i]t has long been this Court's philosophy that 'our original jurisdiction should be invoked sparingly.' " 406 U. S., at 93 (quoting *Utah* v. *United States,* 394 U. S. 89, 95 (1969)). Chief Justice Fuller wrote in 1900 that original "jurisdiction is of so delicate and grave a character that it was not contemplated that it would be exercised save when the necessity was absolute . . . ." *Louisiana* v. *Texas,* 176 U. S. 1, 15. The reasons underlying this restraint have also been long established. The Court has wisely insisted that original jurisdiction be sparingly invoked because it is not suited to functioning as a *nisi prius* tribunal. "This Court is . . . structured to perform as an appellate tribunal, ill-equipped for the task of factfinding and so forced, in original [jurisdiction] cases, awkwardly to play the role of factfinder without actually presiding over the introduction of evidence." *Ohio* v. *Wyandotte Chemicals Corp., supra,* at 498.[1]

---

[1] It is true that in this case the Court decides that judgment on the pleadings is appropriate, and that therefore it is not necessary to conduct

Over 40 years ago, when the Court's docket was considerably lighter than it is today, Chief Justice Hughes articulated the concern that accepting original-jurisdiction cases "in the absence of facts showing the necessity for such intervention, would be to assume a burden which the grant of original jurisdiction cannot be regarded as compelling this Court to assume and which might seriously interfere with the discharge by this Court of its duty in deciding the cases and controversies appropriately brought before it." *Massachusetts* v. *Missouri,* 308 U. S. 1, 19 (1939). The Court has recognized that expending its time and resources on original-jurisdiction cases detracts from its primary responsibility as an appellate tribunal. "The breadth of the constitutional grant of this Court's original jurisdiction dictates that we be able to exercise discretion over the cases we hear under this jurisdictional head, lest our ability to administer our appellate docket be impaired." *Washington* v. *General Motors Corp.,* 406 U. S. 109, 113 (1972). See also *Illinois* v. *Milwaukee, supra,* at 93–94 ("We incline to a sparing use of our original jurisdiction so that our increasing duties with the appellate docket will not suffer"). Original-jurisdiction cases represent an "intrusion on society's interest in our most deliberate and considerate performance of our paramount role as the supreme federal appellate court . . . ." *Ohio* v. *Wyandotte Chemicals Corp., supra,* at 505.

None of these concerns are adequately answered by the expedient of employing a Special Master to conduct hearings, receive evidence, and submit recommendations for our review. It is no reflection on the quality of the work by the Special Master in this case or any other master in any other original-jurisdiction case to find it unsatisfactory to delegate the

a trial. I do not understand the Court, however, to be ruling that original jurisdiction is appropriate only when a trial is not necessary, and therefore in accepting original jurisdiction of this case the Court opens the door to similar cases which may necessitate a trial.

proper functions of this Court. Of course this Court cannot sit to receive evidence or conduct trials—but that fact should counsel reluctance to accept cases where the situation might arise, not resolution of the problem by empowering an individual to act in our stead. I for one think justice is far better served by trials in the lower courts, with appropriate review, than by trials before a Special Master whose rulings this Court simply cannot consider with the care and attention it should. It is one thing to review findings of a district court or state court, empowered to make findings in its own right, and quite another to accept (or reject) recommendations when this Court is in theory the primary factfinder. As Chief Justice Stone put it in *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439, 470 (1945) (dissenting opinion): "In an original suit, even when the case is first referred to a master, this Court has the duty of making an independent examination of the evidence, a time-consuming process which seriously interferes with the discharge of our ever-increasing appellate duties."

## II

The prudential process by which the Court culls "appropriate" original-jurisdiction cases from those which are inappropriate involves two inquiries. In *Massachusetts* v. *Missouri, supra,* at 18, the Court noted:

"In the exercise of our original jurisdiction so as truly to fulfill the constitutional purpose we not only must look to the nature of the interests of the complaining State—the essential quality of the right asserted—but we must also inquire whether recourse to that jurisdiction . . . is necessary for the State's protection."

This dual inquiry was reaffirmed in *Washington* v. *General Motors Corp., supra,* at 113. Or, as put in *Illinois* v. *Milwaukee,* 406 U. S., at 93, "the question of what is appropriate concerns, of course, the seriousness and dignity of the claim; yet beyond that it necessarily involves the availability of an-

other forum where there is jurisdiction over the named parties, where the issues tendered may be litigated, and where appropriate relief may be had." The first prong of the inquiry thus involves an assessment of the "nature of the interests of the complaining state," "the essential quality of the right asserted," "the seriousness and dignity of the claim," and the second prong an examination of the availability of an alternative forum.

The Court accepts original jurisdiction in this case for two separate reasons: because the plaintiff States are injured in their capacity as purchasers of natural gas, *ante,* at 736–737, and because the plaintiff States may sue as *parens patriae, ante,* at 737–739. In ruling that jurisdiction exists because of the plaintiff States' own purchases of natural gas, the Court does not even purport to consider the nature or essential quality of the States' claim or whether it is of sufficient "seriousness and dignity" to justify invoking our "delicate and grave" original jurisdiction. The Court recognizes that "unique concerns of federalism" form the basis of our original jurisdiction, *ante,* at 743, but does not explain how such concerns are implicated simply because one State levies a tax on an item which is eventually passed on to consumers, one of which happens to be another State. The "nature of the interests of the complaining state—the essential quality of the right asserted" is indistinguishable from the interest and right of a private citizen, and the States' claim is of no greater "seriousness and dignity" than the claim of any other consumer.

I would hold that, as a general rule, when a State's claim is indistinguishable from the claim of any other private consumer it is insufficient to invoke our original jurisdiction. The Court in the past has referred to claims by a State in its capacity simply as consumer or owner as mere "makeweights." See *Georgia* v. *Pennsylvania R. Co., supra,* at 450; *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230, 237 (1907); see also *Pennsylvania* v. *West Virginia,* 262 U. S. 553, 611

(1923) (Brandeis, J., dissenting). Cf. *Kansas* v. *Colorado,* 206 U. S. 46, 98 (1907). I do not think such a makeweight should suffice to invoke our original jurisdiction, particularly since States now act as consumers in a vast array of areas.

The fact that States now purchase countless varieties of items for their own use which were not purchased 50 or even 25 years ago suggests that concern for our own limited resources is not the only factor which should motivate us in allowing our original jurisdiction to be invoked sparingly. With the greatly increased litigation dockets in most state and federal trial courts, there will be the strongest temptation for various interest groups within the State to attempt to persuade the Attorney General of that State to bring an action in the name of the State in order to make an end run around the barriers of time and delay which would confront them if they were merely private litigants.[2] Thus in permitting indiscriminate use of our original jurisdiction we not only consume our own scarce resources, but permit in effect the bypassing of ordinary trial courts where private parties are required to litigate the same issues. Such a departure from past practice risks the creation of an entirely separate system for litigation in this country, standing side by side with the state-court systems and the federal-court system. It will obviously be tempting to many interests of a variety of persuasions on the merits of a particular issue to "start at the top," so to speak, and have the luxury of litigating only before a Special Master followed by the appellate-type review which this Court necessarily gives to his findings and recommendations.

If all that is required to invoke our original jurisdiction

---

[2] Experience teaches that these are not empty concerns. See, *e. g., New Hampshire* v. *Louisiana,* 108 U. S. 76, 89 (1883) (State suing as assignee of bondholders, bondholders funding lawsuit and to collect any award); *North Dakota* v. *Minnesota,* 263 U. S. 365, 375 (1923) (State suing for flood damage to farmers' land, farmers funding lawsuit and to collect any award).

is an injury to the State as consumer caused by the regulatory activity of another State, the list of cases which could be pressed as original-jurisdiction cases must be endless. The Court's opinion contains no limiting principle, as mandated by the frequent statements that our original jurisdiction be sparingly invoked and the required inquiry into the nature of the State's claim.

I would require that the State's claim involve some tangible relation to the State's sovereign interests. Our original jurisdiction should not be trivialized and open to run-of-the-mill claims simply because they are brought by a State, but rather should be limited to complaints by States *qua* States. This would include the prototypical original action, boundary disputes, and the familiar cases involving disputes over water rights. In such cases, the State seeks to vindicate its rights as a State, a political entity.[3] Since nothing about the complaint in this case involves sovereign interests, I would hold that there is no jurisdiction on the basis of the States' own purchases of natural gas.[4]

---

[3] Requiring that a State's claim implicate sovereignty interests also serves the oft-repeated expression in our opinions that the Court will not interfere with action by one State unless the injury to the complaining State is of "serious magnitude." See *Alabama* v. *Arizona*, 291 U. S. 286, 292 (1934); *Colorado* v. *Kansas*, 320 U. S. 383, 393, and n. 8 (1943). The Court cites this concern, *ante*, at 736, n. 11, but does not explain why a tax of seven cents per thousand cubic feet of gas is an injury of "serious magnitude."

[4] It is true that the Court has exercised original jurisdiction in cases where the right asserted by a complaining State cannot truly be considered a right affecting sovereign interests. I do not doubt the Court's *power* to exercise original jurisdiction in such cases, nor do I in this case. The decision that a particular type of case was an "appropriate" one for original jurisdiction a century ago, however, does not mean that the same sort of case is an appropriate one today. Justice Harlan explicitly recognized in *Ohio* v. *Wyandotte Chemicals Corp.*, 401 U. S. 493, 497–499 (1971), that societal changes and "the evolution of this Court's responsibilities in the American legal system" affected the determination of what

Nor is this an appropriate case for the plaintiff States to invoke original jurisdiction as *parens patriae.* The Court announces that a State may sue in this capacity in an original action "where the injury alleged affects the general population of a State in a substantial way," *ante,* at 737, but the established rule, which may be different than the Court's paraphrase, was articulated in *Pennsylvania* v. *New Jersey,* 426 U. S. 660, 665 (1976) (*per curiam*) in these terms: "It has . . . become settled doctrine that a State has standing to sue only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens." In *Oklahoma ex rel. Johnson* v. *Cook,* 304 U. S. 387, 394 (1938), Chief Justice Hughes stressed that the principle that a State may sue as *parens patriae* "does not go so far as to permit resort to our original jurisdiction in the name of the State but in reality for the benefit of particular individuals, albeit the State asserts an economic interest in the claims and declares their enforcement to be a matter of state policy."

Here the plaintiff States are not suing to advance a sovereign or quasi-sovereign interest. Rather they are suing to promote the economic interests of those of their citizens who purchase and use natural gas. Advancing the economic interests of a limited group of citizens, however, is not sufficient to support *parens patriae* original jurisdiction. In *Oklahoma* v. *Atchison, T. & S. F. R. Co.,* 220 U. S. 277, 289 (1911), the Court ruled that a State had no standing to challenge in an original action unreasonable freight rates imposed by citizens of another State affecting shippers within the State. In *New Hampshire* v. *Louisiana,* 108 U. S. 76 (1883),

---

was an appropriate case in which to exercise original jurisdiction. The increase in state regulatory efforts on the one hand and the role of States as consumers on the other suggests that new considerations need to be brought to bear on the present question.

the Court rejected an effort by New Hampshire to collect as assignee on Louisiana state bonds, when the proceeds would end up in the hands of the assignors, New Hampshire citizens. And in *North Dakota* v. *Minnesota,* 263 U. S. 365 (1923), the Court turned back an effort by the plaintiff State to sue for flood damage to farmers' land. In my view this suit, brought to benefit state consumers of natural gas, is closer to these cases than those cited by the Court, *Missouri* v. *Illinois,* 180 U. S. 208, 241 (1901) (health menace to entire State from spread of contagious diseases specifically noted); *Kansas* v. *Colorado,* 185 U. S. 125 (1902) (rights to water); *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230 (1907) (rights to air in unpolluted State).

The Court relies heavily on *Pennsylvania* v. *West Virginia,* 262 U. S. 553 (1923), which it describes as "functionally indistinguishable" from the case before us. *Ante,* at 738–739. I think *Pennsylvania* v. *West Virginia,* decided over the dissents of Justices Holmes, Brandeis, and McReynolds, is readily distinguishable, "functionally" or otherwise. The harm in *Pennsylvania* v. *West Virginia* was the threatened complete cessation of deliveries of natural gas. This harmed all the citizens of the State, since it would have prevented any of them from purchasing the natural gas. The harm involved was also far more serious than the harm in this case. In *Pennsylvania* v. *West Virginia,* the harm was the complete halt in deliveries of a commodity upon which citizens of the plaintiff State depended. The opinion there stressed the direct link to the "health, comfort and welfare" of the citizens of Pennsylvania and the serious jeopardy they would be in if their supply of heating gas were suddenly cut off. 262 U. S., at 591–592. Such a direct link to health and welfare is simply not present in this case. The distinction between an increase in the cost of a commodity passed on to consumers complained of here, and the complete cessation of a service upon which citizens depended, seems palpable.

## III

The exercise of original jurisdiction in this case is particularly inappropriate since the issues the plaintiff States would have us decide not only can be, but in fact are being, litigated in other forums. Although this case would come within our original and exclusive jurisdiction if appropriate, the question whether it is appropriate depends in part on the availability of alternative forums. See *Illinois* v. *Milwaukee*, 406 U. S., at 93; *Arizona* v. *New Mexico*, 425 U. S. 794, 796–797 (1976).[5]

The precise issues which the Court finds it somehow necessary to reach today are raised in actions which are currently pending in a Louisiana state court. An action by Louisiana seeking a declaratory judgment that its First-Use Tax is constitutional is pending, *Edwards* v. *Transcontinental Gas Pipe Line Corp.*, No. 216,867 (19th Judicial Dist., East Baton Rouge Parish), as is a refund suit brought by the 17 pipeline companies actually liable for the tax, *Southern Natural Gas Co.* v. *McNamara*, No. 225,533 (19th Judicial Dist., East Baton Rouge Parish). The pipeline companies raise in the Louisiana proceeding the identical challenges raised by the plaintiff States in the present case.[6]

In view of the foregoing I consider *Arizona* v. *New Mexico*, *supra*, controlling. There the Court declined to exercise orig-

---

[5] The Court's dismissal of the significance of *Illinois* v. *Milwaukee* and *Ohio* v. *Wyandotte Chemicals Corp.* as cases not within the exclusive jurisdiction of this Court thus simply does not wash. *Illinois* v. *Milwaukee* indicated the appropriateness of considering the existence of alternative forums in the context of original and exclusive jurisdiction. *Arizona* v. *New Mexico* makes the appropriateness of such consideration in original and exclusive jurisdiction cases quite clear.

[6] The fact that the pipeline companies have seen fit to bring suit on their own behalf undermines the analysis of the Court that the consumers of the gas, both the States and the States' citizens, are the real parties in interest. The pipeline companies obviously have a sufficient interest to justify their suit.

inal and exclusive jurisdiction over a suit brought by Arizona challenging injury to it and its citizens as consumers of electricity generated in New Mexico and subject to a New Mexico tax. As here, the tax was imposed on utilities, not directly on the consumers. The Court quoted language from *Illinois* v. *Milwaukee, supra,* and *Massachusetts* v. *Missouri,* 308 U. S. 1 (1939), concerning the sparing use of our original jurisdiction and the appropriateness of considering alternative forums, and noted that the utilities, like the pipeline companies here, had sued in state court. The Court concluded that "[i]n the circumstances of this case, we are persuaded that the pending state-court action provides an appropriate forum in which the *issues* tendered here may be litigated" (emphasis in original). 425 U. S., at 797. Although the Court in this case stresses that the plaintiff States are not parties in the Louisiana state-court proceedings, in *Arizona* v. *New Mexico* we specifically emphasized that the relevant question was whether the *issues* could be litigated elsewhere.

## IV

The basic problem with the Court's opinion, in my view, is that it articulates no limiting principles that would prevent this Court from being deluged by original actions brought by States simply in their role as consumers or on behalf of groups of their citizens as consumers. Perhaps the principles sketched in this dissent are not the best limiting principles which could be devised, but the difficulty in developing such principles does not lessen the need for them. The absence of limiting principles in the Court's opinion, I fear, "could well pave the way for putting this Court into a quandary whereby we must opt either to pick and choose arbitrarily among similarly situated litigants or to devote truly enormous portions of our energies to such matters." *Ohio* v. *Wyandotte Chemicals Corp.,* 401 U. S., at 504.[7] The prob-

---

[7] It is hardly satisfactory simply to note, as does the Court, that "the

lem is accentuated in this case because it falls within our original and exclusive jurisdiction, which means that similar cases not only can be but *must* be brought here.

In conclusion I can do no better than quote from a dissent Justice Frankfurter penned under similar circumstances:

"Jurisdictional doubts inevitably lose force once leave has been given to file a bill, a master has been appointed, long hearings have been held, and a weighty report has been submitted. And so, were this the last as well as the first assumption of jurisdiction by this Court of a controversy like the present, even serious doubts about it might well go unexpressed. But if experience is any guide, the present decision will give momentum to kindred litigation and reliance upon it beyond the scope of the special facts of this case. . . . [L]egal doctrines have, in an odd kind of way, the faculty of self-generating extension. Therefore, in pricking out the lines of future development of what is new doctrine, the importance of these issues may make it not inappropriate to indicate difficulties which I have not been able to overcome and potential abuses to which the doctrine is not unlikely to give rise." *Texas* v. *Florida,* 306 U. S. 398, 434 (1939).[8]

---

issue of appropriateness in an original action between States must be determined on a case-by-case basis." *Ante,* at 743.

[8] Because of my views on the jurisdictional question I find it unnecessary to address the merits of this case, beyond noting that the pressure in original actions to avoid factual inquiries which this Court of course cannot make may go far to explain the entry of judgment on the pleadings over the ruling by the Special Master that further factual development is necessary to a proper resolution of the issues.