936 So.2d 1226 (2006)
WORD OF LIFE CHRISTIAN CENTER
v.
Mark WEST, Administrator, Ascension Parish Sales and Use Tax Authority, State of Louisiana.
No. 2004-C-1484.
Supreme Court of Louisiana.
April 17, 2006.
Opinion Granting Rehearing September 15, 2006.
*1228 Rainer, Anding & McLindon, Robert R. Rainer, Baton Rouge, for applicant.
Breazeale, Sachse & Wilson, LLP, David Robert Kelly, David Rollins Cassidy, Jeanne Camille Comeaux, Baton Rouge, for respondent.
Emily Winfield Toler, Kanika Roche Tubbs, Geneva Landrum, and Robert F. Mulhearn, Jr., for Cynthia Bridges, Secretary for Department of Revenue, State of Louisiana.
Patrick Michael Amedee, Metairie, for amicus curiae, Lafourche Parish School Board, Ex Officio Tax Collector for the Parish of Lafourche
Richard G. Barham, Shreveport, for amicus curiae, Sales and Use Tax Commission, Caddo-Shreveport.
Dorrell Jarrell Brister, Michael John O'Shee, and Gregory Brian Upton, Alexandria, for amicus curiae, Sales and Use Tax Department, Rapides Parish and Donna J. Andries, Sales and Use Tax Administrator.
Russell Joseph Stutes, Jr., Joel Michael Lutz, and John Christopher Guillet, for amicus curiae, Calcasieu Parish School Board.
Andrew A. Lemmon, Hahnville, for amicus curiae, St. Charles Parish School Board.
Brian Matthew, amicus curiae, for Sales & Use Tax Department of St. Mary Parish Council.
JOHNSON, Justice.
This case involves the application of Louisiana's use tax to out-of-state purchase of airplanes that were subsequently imported into Louisiana and used in interstate commerce. The Ascension Parish Sales and Use Tax Authority takes the position that the airplanes were imported into and used in Ascension Parish, and therefore, the taxpayer is subject to the parish use tax. Word of Life Christian Center, Inc. argues that the airplanes have been in interstate commerce since the time of purchase and are, therefore, excluded from taxation under Louisiana law. The taxpayer relies upon La. R.S. 47:305(E), which provides, in pertinent part, that:
It is not the intention of any taxing authority to levy a tax upon articles of tangible personal property imported into this state . . . nor is it the intention of any authority to levy a tax on bona fide interstate commerce. It is, however, the intention of the taxing authorities to levy *1229 a tax on the sale at retail, the use, the consumption, the distribution, and the storage to be used or consumed in this state, of tangible personal property after it has come to rest in this state and has become a part of the mass of property in this state. . . .
For the reasons that follow, we hold that the airplanes came to rest in Louisiana and became a part of the mass of property in this state. Thus, both airplanes are subject to taxation in Louisiana. However, the property is not subject to taxation in Ascension Parish.

FACTS and PROCEDURAL HISTORY
Word of Life Christian Center, Inc. (hereinafter "Word of Life") is a non-profit religious organization located on Highway 22 in Darrow, Louisiana, in Ascension Parish. Beginning in 1996, Word of Life's ministry saw a growing need to provide for extensive interstate travel by its pastor, Dr. Leroy Thompson, Sr., and supporting staff. To facilitate these travel requirements, Word of Life decided to purchase an airplane.
Initially, Word of Life intended to use the Louisiana Regional Airport in Ascension Parish. On April 21, 1997, Dr. Leroy Thompson, Sr. wrote a letter to Mr. Shafter King, the Airport Commissioner for Ascension and St. James Parishes, which indicated that the ministry was in the process of acquiring a jet airplane and wanted to use the Louisiana Regional Airport. The letter requested that the Louisiana Regional Airport (1) extend its runway to a minimum of 5,000 feet and (2) procure fuel service and adequate hangar space. There is no indication in this record whether the Louisiana Regional Airport in Ascension Parish ever made the requested modifications during the applicable tax period.
In June 1997, Word of Life signed a contract with Lockard Aircraft Sales Co. of Tulsa, Oklahoma for the purchase of a 1974 Cessna Citation Aircraft (Model 500 aircraft) (hereinafter "Airplane I"). The contract was signed at Word of Life's offices in Ascension Parish while the plane was hangared in Tulsa, Oklahoma. Word of Life purchased Airplane I for $1,115,000.00 but paid no sales or use taxes in connection with the purchase.
On August 3, 1997, Dr. Thompson and his wife took delivery of the airplane and flew on Airplane I from Oklahoma to East Baton Rouge Parish, where Airplane I was hangared in between its subsequent interstate and intrastate flights.
The aircraft travel logs and testimony seem to reflect that Airplane I never landed at the Louisiana Regional Airport in Ascension Parish, despite Word of Life's initial intentions.[1] According to the affidavit of pilot Barry Paulk, who piloted Airplane I from August 16, 1997 until its destruction on February 2, 1998:
The "call letters" for the Louisiana Regional Airport in Ascension Parish are "L38". If that aircraft had landed at the Louisiana Regional Airport, those call letters would appear on the attached log in the `to' or `from' columns. As evidenced by the absence of those call letters *1230 on the log attached as Exhibit A, at no time did I pilot aircraft number N501TK to or from the Louisiana Regional Airport in Ascension Parish.
According to Reverend Leroy Thompson Jr.'s affidavit, "Airplane I never landed or took off from Louisiana Regional Airport in Ascension Parish." In his deposition, Dr. Thompson claimed that Airplane I was flown over Ascension Parish to determine if the airport was suitable for landing; it was determined to be unsuitable.
On February 2, 1998, Airplane I traveled from Baton Rouge to Miami, Florida. The airplane was destroyed by a hurricane while hangared in Miami.
After using a chartered plane for a period of time, Word of Life purchased a 1982 Cessna Citation II aircraft (hereinafter "Airplane II"), from Bell Aviation, Inc., a South Carolina company, for $2,240,000.00 in April, 1998. The purchase of Airplane II occurred in South Carolina, but Word of Life took possession of the plane in Texas. No sales or use taxes were paid to either the state of South Carolina or the state of Texas in connection with the purchase. Subsequently, Airplane II was imported into Louisiana. Like Airplane I, Airplane II was hangared in an East Baton Rouge Parish airport in between its subsequent flights. Unlike Airplane I, it is clear that Airplane II landed in Ascension Parish on multiple occasions, beginning in June 1998.
On August 24, 1998, the Ascension Parish Sales and Use Tax Authority (hereinafter "Ascension Parish") assessed a "Sales/ Use Tax, Delinquent Penalty and Interest" against Word of Life in connection the purchase and use of Airplane I. The $64,183.86 assessed by Ascension Parish consisted of $44,600.00 in use tax, $11,150.00 as a delinquent penalty, and $8,433.86 in interest. On October 20, 1998, Word of Life paid the amount due and noted that the taxes were being "Paid in Protest."
Word of Life filed a Petition for Refund on November 19, 1998, where it alleged that since Airplane I was purchased out of state and was used in interstate commerce, Louisiana's interstate commerce exclusion applied and no use taxes were owed pursuant to La. R.S. 47:305(E).
Ascension Parish filed a Second and Third Supplemental and Amended Reconventional Demand which assessed Word of Life's tax liability for Airplane II was $89,600.00. There is nothing in the record to indicate that Word of Life ever paid these taxes.
Thereafter, Ascension Parish filed a Partial Motion for Summary Judgment, where it argued that the purchase and use of Airplanes I and II were taxable events pursuant to local ordinances, reserving for trial the issue of attorney fees. Word of Life filed a cross Motion for Summary Judgment, where it argued that the out-of-state purchase and subsequent use of Airplanes I and II were nontaxable events, since both airplanes were used almost exclusively in interstate commerce.
Following a December 9, 2002 hearing, the trial court granted Word of Life's Motion for Summary Judgment and denied Ascension Parish's Partial Motion for Summary Judgment. As a result, the trial court abated Ascension Parish's tax assessment and ordered the Department of Revenue to refund the $64,183.86 that Word of Life paid under protest. Ascension Parish appealed.

Court of Appeal
The court of appeal affirmed the trial court's ruling. In its opinion, the court discussed both the "taxable moment" and "ultimate use" doctrines. First, the court held that for property used in interstate commerce, a "taxable moment" occurs *1231 when the property comes to rest in Louisiana and becomes a part of the mass of property in Louisiana. Word of Life Christian Center v. Mark West, Administrator, Ascension Parish Sales and Use Tax Authority State of Louisiana, XXXX-XXXX (La.App. 1st Cir.5/14/04), 879 So.2d 213, 214. Second, the court concluded that if an item is "ultimately used" in interstate commerce then it has not come to rest and become a part of the mass of property in this state and, therefore, is not subject to the use tax. In essence, the court held that there is no "taxable moment" when the subject property is "ultimately used" in interstate commerce. This ruling followed the holdings in The Shaw Group, Inc. v. John H. Kennedy, Secretary, Dept. of Revenue, State of Louisiana, (La.App. 1st Cir.2000), 767 So.2d 937 and Tigator Inc.v. West Baton Rouge Police Jury, 94-1771, 94-1772 (La.App. 1st Cir.5/5/95) 657 So.2d 221, writ denied, 95-2126 (La.11/17/95), 663 So.2d 712.
In a dissent, Judge Gaidry suggested that the "ultimate use" test has no application here. In support of his position, Judge Gaidry cited Cotten v. Collector of Revenue, 90-1383 (La.App. 4th Cir.1991), 579 So.2d 499, and Vector Company, Inc. v. Benson, 491 S.W.2d 612 (Tenn.1973).
We granted Ascension Parish's writ of certiorari to decide the following issue which is res nova before this Court and resolve the conflicting decisions among the circuit courts of appeal, namely, the applicability of state and local use tax to the out-of-state purchase of tangible property which is subsequently imported into Louisiana then "ultimately used" in interstate commerce, in light of La. R.S. 47:305(E), which prohibits a tax on bona fide interstate commerce.

LAW and ANALYSIS

Judicial Notice of Local Ordinances
Before considering the issue, we must address a procedural issue raised by Word of Life as to whether this court may consider the merits of this writ application since Ascension Parish failed to include in the record below certified copies of the tax ordinances at issue. La. R.S. 13:3712 provides, in pertinent part, that:
B. All courts of record in the state shall take judicial cognizance of the municipal ordinances and parochial ordinances which may be enacted by governing authority of any town, city, municipality, or parish within their respective jurisdictions whenever certified copies of such ordinances have been filed with the clerk of said court.
La. R.S. 13:3712 supplemented former La. R.S. 15:422(1), which provided for judicial notice of "laws" but excluded municipal and parochial ordinances. See, La. C.E. art. 202 Comments 1998-(b).
In Klohn v. Louisiana Power & Light, 406 So.2d 577, 578 (La.1981), this court considered La. R.S. 13:3712 and held that the certified copies of the ordinances "should be made part of the record either before its lodging in the appellate court or. . . by the filing of a motion to supplement the record in the appellate court." Id. at 579.
In 1998, the Louisiana Legislature enacted La. C.E. art. 202, Judicial Notice of Legal Matters, by Acts 1988, No. 515, § 1, which incorporated the approach of La. R.S. 13:3712, but also extended the statute's scope. Pertinent to our discussion, La. C.E. art. 202(B) mandates that a court take judicial notice of an ordinance of any political subdivision within its jurisdiction either when the proper certified copy has been filed with the clerk of court or when a party "provides the court any information needed by it to comply with the request." La. C.E. art. 202 Comments-1988 (b). Specifically, La. C.E. art. 202(B) provides, in pertinent part, as follows:
B. Other legal matters. (1) A court shall take judicial notice of the following *1232 if a party requests it and provides the court with the information needed by it to comply with the request, and may take judicial notice without request of a party of: (c) Ordinances enacted by any political subdivision of the State of Louisiana.
Ascension Parish requested that this court take judicial notice of five local ordinances and provided this court with the information needed to comply with the request.[2] Therefore, we take judicial notice of Ascension Parish's local ordinances which form the basis of this suit, pursuant to La. C.E. art. 202(B).

DISCUSSION

Historical Perspective/Sales and Use Taxes
States began enacting sales tax statutes as emergency measures in the early 1930s in response to the plummeting revenues and massive unemployment that coincided with the Great Depression.[3] Since then, states have come to rely heavily on sales and use taxes to meet their fiscal responsibilities. Louisiana collects approximately one third of its total tax revenues in general sales taxes.[4]
Sales and use taxes are consumption taxes, meaning they are intended to apply to the final stage in the sales transaction imposed on specific sales.[5] Sales and use taxes are complementary taxes. The sales tax applies when the taxable transaction is consummated within the taxing jurisdiction. The use tax applies when the transaction is consummated outside the taxing jurisdiction, and the goods are subsequently imported and used in the taxing jurisdiction. Thus, the taxes secure revenues that arise from similar transactions *1233 that can occur in different taxing jurisdictions. Sales and use taxes are different in conception and may have to be justified on different constitutional grounds. McLeod v. J.E. Dilworth Co., et al., 322 U.S. 327, 64 S.Ct. 1023, 88 L.Ed. 1304 (1944). Therefore, we must distinguish between sales and use taxes to narrow our focus on the issues before us.
A sales tax is a single-stage tax[6] on consumer spending that applies to final sales for personal use and consumption.[7] The sales tax is a tax imposed on the buyer's use or consumption of the item sold, that is passed on to the consumer through the addition of the sales tax to the purchase price.[8]
Shortly after states adopted the sales tax, it became necessary to impose a complementary use tax because the sales tax alone was unable to reach sales made outside of the state's borders or in interstate commerce, even though the purchased goods were imported into a specific taxing jurisdiction for use.[9] The United States Supreme Court addressed this restriction on the state's ability to tax sales in interstate commerce in Helson v. Commonwealth of Kentucky, 279 U.S. 245, 49 S.Ct. 279, 73 L.Ed. 683 (1929), where the United States Supreme Court held that a state law which directly burdens interstate commerce by taxation regulates "beyond the power of the state under the Constitution", i.e. is unconstitutional. Helson, at 249. In this case, the Supreme Court held that requiring an interstate ferryboat to pay use tax on fuel consumed was an unconstitutional burden on interstate commerce. In St. Louis-S.F. Ry. v. Public S.C. of Missouri, 261 U.S. 369, 43 S.Ct. 380, 67 L.Ed. 701 (1923), the Supreme Court noted that "although interstate commerce is outside of regulation by a state, there may be instances in which a state, in the exercise of a necessary power, may affect that commerce."
Use tax developed because local merchants were disadvantaged when local consumers purchased similar goods in a state where no sales tax or a lower tax was imposed. The states realized that they would lose business and their sales tax base would be eroded because of this lack of tax parity between local purchases and purchases made in non-tax states. The use tax was enacted to address these concerns. The use tax is collected against a taxpayer's use, storage, or consumption of property, typically purchased out of state, that would have been subject to a sales tax in the state of use had the goods been bought within the taxing jurisdiction.[10]
In Fontenot v. S.E.W. Oil Corp., 232 La. 1011, 95 So.2d 638 (1957), this court, citing Mouledoux v. Maestri, 197 La. 526, 2 So.2d 11 (La.1941), held that a use tax is an integrated part of a sales tax, its purpose being to remove the buyer's temptation to place their orders in other states in *1234 an effort to escape payment of the tax on local sales. Fontenot, supra, at 640.
A taxpayer is typically granted a credit against the use tax when the taxpayer has previously paid a sales or use tax to another taxing jurisdiction in connection with the purchase of his taxable goods.[11] This credit prevents multiple taxation by taxing jurisdictions that the goods may move through following the out-of-state purchase.
The seminal case on use taxes is Henneford v. Silas Mason Co., Inc., 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937) where the United States Supreme Court articulated the underlying philosophy of use taxes as establishing equality between local and foreign merchants and revenue protection for the states. Henneford involved a use tax levied by the state of Washington against goods purchased out-of-state but subsequently imported into Washington for local use. The court analyzed Washington's use tax statute and concluded that the statute imposed a tax equal to the tax that would be imposed on local businesses had the goods been purchased in-state. The court held that:
One of its effects must be that retail sellers in Washington will be helped to compete upon terms of equality with retail dealers in other states who are exempt from a sales tax or any corresponding burden. Another effect, or at least another tendency, must be to avoid the likelihood of a drain upon the revenues of the state, buyers being no longer tempted to place their orders in other states in the effort to escape payment of the tax on local sales. Id. at 581, 57 S.Ct. 524.
Further, the court held as follows:
Equality is the theme that runs through all the sections of the statute. There shall be a tax upon the use, but subject to an offset if another use or sales tax has been paid for the same thing . . . When the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed.[12]Id. at 583-585, 57 S.Ct. 524.
Henneford determined that the Washington use tax was not a tax on interstate commerce, but a tax on the privilege of use after interstate commerce was at an end. Id. at 582, 57 S.Ct. 524. The United States Supreme Court furthered this analysis in Southern Pacific Co. v. Gallagher, *1235 306 U.S. 167, 59 S.Ct. 389, 83 L.Ed. 586 (1939).
In Southern Pacific the Court extended the reach of the use tax by upholding a state's right to apply a use tax to not only out-of-state goods that were imported into a taxing jurisdiction for local use, as in Henneford v. Silas Mason, but also to out-of-state goods that were imported into a taxing jurisdiction for subsequent use in interstate commerce.
The issue before the Southern Pacific court was the constitutionality of a California use tax that was levied against the out-of-state purchase of goods by the Southern Pacific Company, a Kentucky corporation that handled intrastate, interstate, and foreign commerce over its railroad system, which traveled over many taxing jurisdictions across the continent.
The Southern Pacific Company would purchase materials outside of California and then ship the materials to its California office. The materials were then used, or stored for subsequent use, in Southern Pacific's interstate transportation business.
The California Use Tax Act defined "use" as the exercise of any right or power incident to ownership, except sale in the regular course of business. The court focused on two lines of authority to determine whether or not California's use tax impermissibly burdened interstate commerce. First, the court cited Helson & Randolph v. Kentucky, supra, for the proposition that a tax imposed on the privilege of operating in, or upon carrying on, interstate commerce is invalid. Second, the court cited Nashville, C. & St. L. Ry. Co. v. Wallace, 288 U.S. 249, 53 S.Ct. 345, 77 L.Ed. 730, for the proposition that use and withdrawal from storage for subsequent use, were taxable intrastate events, separate and distinct from interstate commerce.
The Southern Pacific court concluded that the goods which Southern Pacific Company imported into California had come to rest in California prior to being used as instruments of interstate commerce, and therefore were subject to a "taxable moment." The court held as follows:
In the present case some of the articles were ordered out of the state . . . and installed immediately on arrival at the California destination . . . We think there was a taxable moment when the (goods) had reached the end of their interstate transportation and had not begun to be consumed in interstate operation. At that moment, the tax on storage and use  retention and exercise of a right of ownership, respectively  was effective. The interstate movement was complete. The interstate consumption had not begun. Id. at 177, 59 S.Ct. 389.
The "taxable moment" analysis is an inquiry which focuses on three discrete stages of the interstate commerce journey of goods into a taxing jurisdiction. The first stage is the interstate transportation of out-of-state purchased goods into the taxing jurisdiction. The second stage is the end of that interstate transportation, which includes the withdrawal of those goods from interstate commerce, and implies that the goods have come to rest in the taxing jurisdiction and become part of the mass of the property of the state. The principal focus here is the period of time, however slight, that the taxpayer used, stored, or consumed the goods in the taxing jurisdiction. The third stage is the subsequent use, if any, of the goods in interstate commerce.
Several state courts have embraced the taxable moment doctrine and the reasoning of Southern Pacific, supra, when analyzing the validity of a state use tax imposed *1236 against the out-of-state purchase of corporate airplanes, as in the present case. In Vector v. Benson, supra, the taxpayer was a Tennessee corporation that purchased three airplanes in Georgia and North Carolina to further its real estate development business. The taxpayer paid no sales or use tax to either Georgia or North Carolina in connection with the aircraft. Following the purchase, the airplanes were imported into Knoxville, Tennessee, the taxpayer's domicile, where they were hangared. Thereafter, the planes were used principally in interstate commerce. Id. at 613.
The court dismissed the taxpayer's argument that its intended use of the aircraft in interstate commerce negated Tennessee's taxing jurisdiction. The court found this position untenable under Nashville, Chattanooga & St. L. RR. Co. v. Wallace, supra, a case relied on by the United States Supreme Court in Southern Pacific, supra. The Supreme Court of Tennessee cited Wallace, supra, for the principle that, once the out-of-state purchased goods were imported into the taxing jurisdiction, and were stored, they came to rest. Thus, when property has come to rest in storage, the state is free to tax it, "notwithstanding its prospective use as an instrument of interstate commerce . . . ." quoted in Vector, 491 S.W.2d at 615.
The Supreme Court of Oklahoma addressed a similar issue in In Re: Woods Corp., 531 P.2d 1381 (Okl.1975). Here, the taxpayer was a Delaware corporation doing business in Oklahoma, who purchased an airplane from a California seller for $430,000. The airplane was delivered to the taxpayer in Montana and subsequently flown into Oklahoma. No sales or use taxes were paid prior to the airplane's importation into Oklahoma. Id. at 1382. The plane was used for interstate flights 97% of the time after being brought into Oklahoma. Id.
The Oklahoma Supreme Court in Woods concluded that "the airplane was not an instrumentality of interstate commerce when it arrived in Oklahoma and a taxable moment occurred between the time of delivery to Oklahoma and the time Woods commenced using the aircraft in interstate commerce."
Similarly, in Sundstrand Corporation v. Department of Revenue of the State of Illinois, 34 Ill.App.3d 694, 339 N.E.2d 351 (1975), the appellate court of Illinois affirmed the validity of a state use tax imposed on the taxpayer's out-of-state purchase of an airplane which was subsequently imported into Illinois and then used in interstate commerce. The taxpayer's principal office was in Illinois. However, the plane was purchased from an Ohio company, for $850,000. After importation into Illinois, the plane was used principally in interstate commerce, although hangared in Illinois between flights. The taxpayer argued that a levy of the use tax on the airplane was an unconstitutional burden on interstate commerce. The court rejected the taxpayer's contention and affirmed the use tax.
The court cited Southern Pacific, supra, for the proposition that "a tax on property or upon a taxable event in the state, apart from operation, does not interfere with interstate commerce." Sundstrand, 339 N.E.2d at 354. Furthermore, the court relied on Southern Pacific, supra, for the following principle:
what is important is whether there was a taxable moment in the state when the plane had reached the end of its interstate transportation and had not yet begun to be consumed in interstate operation. If so the tax on storage and use  retention and the exercise of a right of *1237 ownership  was effective. Sundstrand, 339 N.E.2d at 354.
The Tax Court of New Jersey, in KSS Transportation Corp. v. Baldwin, 9 N.J.Tax 273 (1987) gave a succinct summary of the taxable moment doctrine. The court held that the taxable moment doctrine:
[G]ives the purchaser control over whether it is subject to tax liability. If the aircraft is brought directly to its home base state, the purchaser is subject to a use tax. If the aircraft is used to transport passengers or property in interstate commerce in the few days preceding its passage to its home base state, the purchaser is not subject to use tax in its home base state and may never be subject to a sales or use tax. This test assumes that the aircraft, while an instrumentality of interstate commerce, is not taxable unless a "taxable moment" in which the aircraft is not in interstate commerce can be identified. Hangarage and routine maintenance during interstate flights have been held to be a continuation of interstate commerce. For a "taxable moment" to occur, either the aircraft must come to rest in the taxing state prior to being introduced into interstate commerce, or its stay in the state when it is not engaged in interstate commerce must be protracted. Id. at 282.
In the case sub judice, Ascension Parish argues that a "taxable moment" occurred when Word of Life's airplanes were withdrawn from interstate transportation and came to rest in Louisiana. This occurred prior to the airplanes' "ultimate use" in interstate transportation. Ascension Parish argues that the airplanes landed at Louisiana airports, were housed in Louisiana hangars, took on and discharged passengers and crew, were refueled, serviced and maintained in Louisiana, and derived the benefits of public airports, state and local fire protection and police protection between flights.
Ascension Parish relies on Cotten v. Collector of Revenue, State of Louisiana, 579 So.2d 499 (La.App. 4th Cir.1991)[13] and Comdisco v. Secretary of Revenue and Taxation, 93-1695 (La.App. 1st Cir.10/7/94) 647 So.2d 341, writ denied, 95-0257 (La.3/30/95) 651 So.2d 837.[14]
In opposition, Word of Life argues that The Shaw Group, Inc. v. John H. Kennedy, Secretary, Dept. of Revenue, State of Louisiana, (La.App. 1st Cir.2000), 767 So.2d 937 is directly on point and is controlling. Shaw involved a use tax imposed on Shaw's out-of-state purchase of two corporate airplanes. The court of appeal interpreted the taxable moment doctrine as follows:

*1238 Whether property has come to rest in Louisiana and has become a part of the mass of the property in this state is determined by its "ultimate use." Tigator Inc.v. West Baton Rouge Police Jury, 94-1771, 94-1772 (La.App. 1st Cir.5/5/95) 657 So.2d 221 at 228, writ denied, 95-2126 (La.11/17/95), 663 So.2d 712 citing Mobil Oil Corp./The Superior Oil Company v. McNamara, 517 So.2d 278, 279 (La.App. 1st Cir.1987), Traigle v. PPG Industries, Inc. 332 So.2d 777 (La.1976), and McNamara v. U.O.P., Inc., 389 So.2d 741 (La.App. 2nd Cir. 1980), writ denied, 396 So.2d 898 (La. 1981). Shaw, supra, at 939.
Applying the "ultimate use" test to the "taxable moment" doctrine, the court held that the taxpayer purchased the airplanes with the intention to transport employees in interstate business travel. Therefore, the ultimate use of the airplanes was in interstate commerce and La. R.S. 47:305(E) barred the State's imposition of a use tax on the airplanes.
The court rejected the State's contention that a taxable moment occurred when the airplanes were delivered in Louisiana. In so doing, the court relied on Tigator, supra, as follows:
Although the court in Tigator found a "taxable moment" and upheld the tax imposed with regard to the trailers and repair parts, that portion of the court's decision concerned a sales tax, not a use tax. The facts surrounding those transactions are different than the one we are faced with in this case. That portion of the Tigator opinion is not applicable. Id. at 940.
In the present case, Word of Life states that the parallels between Shaw and the case sub judice are clear. Specifically, in both instances, the planes were purchased for and subsequently used in interstate commerce.
La. C.C. art. 9 provides that when a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. In interpreting a statute, we are required to give the words of a law "their generally prevailing meaning." La. C.C. art. 11; Rester v. Moody & Stewart, 172 La. 510, 134 So. 690 (1931).
La. R.S. 47:301(19) states that "use tax" includes the use, the consumption, the distribution, and the storage as herein defined. La. R.S. 47:301(18) provides, in pertinent part, as follows: "For purposes of the imposition of the sales and use tax levied by a political subdivision or school board, `use' shall mean and include the exercise of any right or power over tangible personal property incident to the ownership thereof. . . ." The statute says nothing about "ultimate use" merely "use." The interpretation of "use" as "ultimate use" conflicts with a plain reading of the statute and leads to absurd consequences. Under Word of Life's reading, so long as a taxpayer intends to use out-of-state purchased goods in interstate commerce, any and all use in the taxing jurisdiction would be immune from state taxation. Such a conclusion contradicts the underlying purposes of the use tax which are: (1) to protect local merchants who would face a competitive disadvantage if resident consumers could purchase similar goods without tax, or at a lower tax rate, in another jurisdiction; and (2) to compensate the state for the erosion of its sales tax base when resident consumers purchase out-of-state goods and then import those goods into Louisiana for use. Indeed, that is the reality of the present case. If Word of Life or similar resident consumers can travel out-of-state and purchase airplanes or other tangible personal property and *1239 not pay a sales or use tax, then import those goods into Louisiana for subsequent use in interstate commerce, and be immune from Louisiana use tax because they ultimately used, or planned to use, the goods in interstate commerce, then they have effectively circumvented decades of use tax jurisprudence.
The Supreme Court of Arkansas, in Skelton v. Federal Express Corporation, 259 Ark. 127, 531 S.W.2d 941 (Ark.1976), a case involving the imposition of a state use tax on the taxpayer's importation and use of an airplane, held that "Regardless of the ultimate use of the aircraft, the use and storage . . . are taxable intrastate events, separate and apart from interstate commerce." Id. at 131, 531 S.W.2d 941. The Supreme Court of Tennessee in Vector, supra, held that "[t]he idea that the craft was not taxable, because Vector intended to use the aircraft in interstate commerce after they had acquired a local situs, is untenable under Nashville, Chattanooga & St.L.RR. Co. v. Wallace . . . ." Vector, 491 S.W.2d at 614.
We reject an interpretation which defines "use" as "ultimate use," and instead embrace the reasoning of Southern Pacific, supra, which holds that a taxable moment occurs when out-of-state purchased goods have not yet reached the end of their interstate transportation into the taxing jurisdiction, and have not yet begun their subsequent journey in interstate commerce. Id. at 177, 59 S.Ct. 389. Consequently, we expressly overrule Shaw and Tigator, which barred a use tax by substituting an "ultimate use" test as it relates to La. R.S. 47:305(E). This Court rejects Tigator's and Shaw's position that "whether property has come to rest in Louisiana and has become a part of the mass of the property in this state is determined by its ultimate use." Tigator, 657 So.2d at 228, and Shaw, 767 So.2d at 939. This Court also refutes the theory that "if the ultimate use of the property was for interstate commerce, the property is not subject to the use tax even if imported to, stored and occasionally used in Louisiana." Id. Further, Tigator erroneously reasoned that the "temporary time" the property remained in Louisiana precludes the taxation of the property in Louisiana. Id. at 229.
In the present case, the primary issue is whether a "taxable moment" occurred when the out-of-state purchased airplanes were imported in Louisiana and had not yet begun to be consumed in interstate operation. We note that Word of Life paid no sales or use taxes to either Oklahoma for the purchase of Airplane I or South Carolina or Texas in connection with the purchase of Airplane II. Following the purchases, both planes were imported and hangared in East Baton Rouge Parish until the planes were subsequently used in interstate commerce. Notwithstanding the prospective use of the plane as instruments of interstate commerce, it is well settled in jurisprudence that once these planes were imported and hangared in East Baton Rouge, the planes came to rest in Louisiana. At that moment, however slight, when the airplanes had been withdrawn from interstate commerce and came to rest in Louisiana, Louisiana's tax on storage and use was effective.[15] Therefore, a "taxable moment" occurred in Louisiana.
*1240 After determining that a taxable moment occurred, we must now focus on whether the Louisiana Legislature intended to bar Word of Life from tax liability pursuant to La. R.S. 47:305(E).

Louisiana's Interstate Commerce Exclusion: Statutory and Constitutional Framework
The Louisiana Legislature enacted Title 47, Louisiana's interstate commerce exclusion, in 1948. The pronouncement that it is not the state's intention to levy a tax on bona fide interstate commerce has been a part of the statute since its inception,[16] consistent with federal jurisprudence at the time of its enactment.
In 1977, the United States Supreme Court made a radical shift in the conceptual framework used to analyze Commerce Clause cases. In Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), the United States Supreme Court repudiated its earlier opinions that focused on the formal language of a tax statute and focused instead on the statute's practical effect. Id. at 279, 97 S.Ct. 1076. The shift was necessary because the court recognized that the current law at that time had "no relationship to economic realities." Id.
Complete Auto, supra, synthesized the evolving federal Commerce Clause jurisprudence into a four-prong test whereby the constitutionality of a state tax on interstate commerce is upheld if: (1) the tax is applied to an activity with a substantial nexus to the taxing jurisdiction; (2) the tax is fairly apportioned; (3) the tax is non-discriminatory; (4) the tax is fairly related to services provided by the taxing jurisdiction. Id.
States may now tax interstate commerce so long as the Complete Auto, four-prong test is satisfied. Some states held that the "taxable moment" doctrine was obsolete after Complete Auto, supra. They opined that there was no longer a need for the doctrine that identified when interstate commerce came to an end since modern Commerce Clause jurisprudence, as announced in Complete Auto, supra, now allowed the states to tax interstate commerce, so long as the four-prong test was met. For example, in Director of Revenue v. Superior Aircraft Leasing Company, 734 S.W.2d 504 (Mo.1987), the Supreme Court of Missouri affirmed the imposition of a state use tax against the taxpayer's purchase, and subsequent importation, of an airplane into Missouri. The court opined that "the Director of Revenue contends that the `taxable moment' analysis, adopted by this Court in Management Services [v. Spradling, 547 S.W. 2d 466 (Mo. banc 1977)] and applied in King [v. L & L Marine Service, 647 S.W. 2d 524 (Mo. banc 1983)], is no longer the proper method for determining the validity of a state tax and we must agree. The contemporary approach of the United States Supreme Court was announced in Complete Auto Transit, Inc. v. Brady." Director of Revenue v. Superior Aircraft Leasing Company, 734 S.W.2d at 506. The Tax Court of New Jersey in KSS Transportation Corp., v. Baldwin, 9 N.J.Tax 273 (1987), made a similar declaration. In KSS Transportation, the New Jersey Tax Court upheld the imposition of a state use tax on the taxpayer's purchase, and subsequent importation, of an airplane into New Jersey. The court concluded as follows:
. . . that the out-of-state purchase of a corporate aircraft having its home base in New Jersey, by a New Jersey corporation which has paid no sales or use tax to any other state on the purchase, is *1241 subject to use tax by New Jersey, and that such tax is not in conflict with the Commerce Clause of the United States Constitution. Id. at 287.
Louisiana, on the other hand, has maintained its statutory prohibition against taxing interstate commerce despite the fundamental changes in federal Commerce Clause jurisprudence. Louisiana courts typically must approach an issue involving the applicability of Louisiana's interstate commerce exclusion in a two-prong fashion, given the differences between La. R.S. 47:305(E), which recognizes the "taxable moment" doctrine, and contemporary federal Commerce Clause jurisprudence, as articulated by the United States Supreme Court in Complete Auto, which holds that interstate commerce may be taxed irrespective of a "taxable moment".
The "taxable moment" issue was distinguished from the modern commerce clause question by the United States Supreme Court in D.H. Holmes Co. v. McNamara, 486 U.S. 24, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988), a case involving Louisiana's use tax and mail order catalogs. In that case, the tangible personal property consisted of catalogs designed in New York, printed in Atlanta, Boston, and Oklahoma, then mailed to residents of Louisiana at the direction of the taxpayer, D.H. Holmes. The Louisiana Department of Revenue conducted an audit of the taxpayer and assessed delinquent use taxes on the value of the catalogs. Applying the taxable moment doctrine, the court of appeal concluded that "After the catalogs were in Louisiana mailboxes they were not part of interstate commerce and became part of the property mass in this state." Additionally, the court held that "Distribution of the catalogs certainly constitutes `use' by Holmes under the statute and is subject to the tax." 505 So.2d 102, 105 (La. App. 4th Cir. 1987).
The court then cited the Complete Auto four-prong test and applied it to the facts before it. The court held that the first requirement was met because D.H. Holmes had 13 stores, 5000 employees and over 1,000 catalogs distributed in the state. Id. at 106. Next, the court determined that the second and third prong requirements of fair apportionment and non-discrimination were met because La. R.S. 47:305 was applied to catalogs printed within the state and outside the state used to boost sales in Louisiana for the benefit of D.H. Holmes and its employees. Lastly, the court determined that Louisiana provided essential benefits and services to D.H. Holmes' stores, and that there was no multiplicity of taxes since the taxpayer had paid no taxes to any other jurisdiction.
The United States Supreme Court affirmed the lower court's decision and held that imposition of the Louisiana use tax did not violate the Commerce Clause of the United States. Id. at 24, 108 S.Ct. 1619.
This court discussed both the "taxable moment" doctrine and the Complete Auto, supra, four-prong test in Columbia Gulf v. Broussard, 94-1650 (La.04/10/95), 653 So.2d 522, a case involving Louisiana's use tax and natural gas.[17]
*1242 In Columbia Gulf v. Broussard, 94-1650 (La.04/10/95), 653 So.2d 522, this court held that natural gas had come to rest in the state and was thus, subject to the state use tax, and that the commerce clause did not preclude imposition of the tax. Id. at 522.
The issue before this court was whether La. R.S. 47:305(E) or Complete Auto, supra, barred the imposition of Louisiana's use tax on "compressor fuel." Columbia Gulf, at 523. The taxpayer was a Delaware corporation doing business in Louisiana that used underground pipes to transport natural gas from offshore Louisiana to its Kentucky affiliate. During the course of travel, the gas would lose some of its pressure and would be recompressed at four Louisiana compressor stations. The compressor stations used diverted gas from the pipelines to power its engines and boost the interstate gas pressure.
The Louisiana Department of Revenue assessed a use tax on the diverted gas that was consumed in the state. The taxpayer, Columbia Gulf, paid the tax liability under protest and filed suit to recover the amounts paid. The taxpayer argued that a use tax on natural gas diverted from interstate gas and used solely to propel other interstate gas violated the Commerce Clause of the United States Constitution and violated the requirements of La. R.S. 47:305(E). This court rejected the taxpayer's arguments and affirmed the tax.
This court cited La. R.S. 47:305(E) and held that the "statute clearly intends taxation of property consumed in the state." Moreover, this court concluded that when "the natural gas compressor fuel is consumed, it comes to rest and becomes a part of the state's property."
At oral arguments before this court, the taxpayer asserted that it was not attacking the constitutionality of the subject use taxes, but rather was arguing that Airplanes I and II were used in interstate commerce and were excluded from state taxation by La. R.S. 47:305(E). Therefore, the threshold issue before this court pertains to whether the legislature intended to exclude Word of Life from tax liability pursuant to La. R.S. 47:305(E).
The statutory intent of the Louisiana use tax law is expressed in La. R.S. 47:305(E),[18] which provides that it is not its intention "to tax bona fide interstate commerce" but to "tax tangible personal property after it has come to rest in this state and has become a part of the mass of property in this state." The purpose of the statute is not to burden goods and products legitimately involved in the flow of interstate commerce which never come to rest in Louisiana. In evaluating the statute, it is important to note that every word serves some useful purpose. Sultana Corporation v. Jewelers Mutual Insurance Company, 03-0360, p. 9 (La.12/3/03), 860 So.2d 1112, 1119.
We previously determined that both airplanes came to rest and became a part of the mass of property in Louisiana. Next, we must analyze the terms "bona fide interstate commerce" used in La. R.S. 47:305(E). The legislature carefully drafted the statute to include the words "bona fide," which describes and limits the scope of "interstate commerce" which the state is *1243 prohibited from taxing. It is clear that the legislature did not intend to exclude all forms of "interstate commerce" from taxation. BLACK'S LAW DICTIONARY 285 (7th ed.1999), defines "commerce" as "[t]he exchange of goods and services . . . involving transportation between cities, states, and nations." To interpret "bona fide interstate commerce" as goods traveling in interstate commerce would be to ignore the insertion of the terms "bona fide," which clearly limits the definition of "interstate commerce." The fact that owners use the durable goods (such as airplanes and/or automobiles) for travel across state lines does not necessarily classify the goods as part of "bonafide interstate commerce" as used in La. R.S. 47:305(E).
In the case sub judice, we agree with Ascension Parish and hold that a "taxable moment" occurred which permits Louisiana to apply the use tax to Word of Life's out-of-state airplane purchases since the airplanes came to rest here and became a part of the mass of property in Louisiana. Therefore, we find that La. R.S. 47:305(E) clearly speaks to taxing both planes in Louisiana since the planes came to rest in Louisiana and became a part of the mass of Louisiana property. Thus, Word of Life is subject to the use tax in Louisiana. Recognizing such, we must evaluate whether Ascension Parish has authority to assess a use tax under its parish taxing ordinances.

THE ASCENSION PARISH ORDINANCES
The Ascension Parish Sales Tax District No. 2 Sales and Use Tax ordinance was adopted on August 18, 1994, and is representative of the five ordinances that form the basis of Ascension Parish's claim against Word of Life.[19] The pertinent language mimics the state legislation:
Section 3.02. It is not the intention of this ordinance to levy a tax upon articles of tangible personal property imported into the [parish] . . . for export; nor is it the intention of this ordinance to levy a tax on bona fide interstate commerce. It is, however, the intention of this ordinance to levy a tax on the sale at retail, the use, the consumption, the distribution and the storage to be used or consumed in the [parish], of tangible personal property after it has come to rest in the [parish] and has become a part of the mass of property in the [parish].
In this matter, the language of the ordinance must be evaluated because it is the ordinance upon which Ascension Parish relies to impose the tax. Considering the above quoted portion of the ordinance, it is obvious that the parochial taxing authority adopts the "taxable moment" analysis stated in La. R.S. 47:305(E). Applying that analysis to the facts of this case, it appears that the airplanes purchased by Word of Life are not subject to the Ascension Parish use tax because there was never a taxable moment for either airplane in that parish.
For Airplanes I and II, a "taxable moment" occurred, and the planes were subject to Louisiana's use tax, at the moment that they reached the end of their interstate transportation to Louisiana and had not yet begun to be used in interstate commerce. This moment occurred in East Baton Rouge Parish. Both airplanes were purchased out-of-state and flown to East Baton Rouge Parish where they were hangared. Airplane I never landed in Ascension Parish because initially the landing strip was too small. Although Airplane II was purchased in April of 1998, its first flight to Ascension Parish was not until *1244 June of that year. Thereafter, Airplane II traveled to Ascension Parish on a substantial number of occasions, primarily to load and unload passengers. The use in Ascension Parish of Airplane II was a "pass through use," involving only a brief stop in Ascension Parish before the flight, which was often an interstate flight, was continued.
Louisiana Revised Statutes 47:301(18) defines "use" as "the exercise of any right or power over tangible personal property incident to ownership thereof." In post-argument brief to this court, the Ascension Parish taxing authority argues that the exercise of any right or power over tangible personal property (the taxable act) is, by definition, citing La. C.C. art. 473, an incorporeal movable that, in the absence of a physical location, must be attributed to the place of incorporation, or domicile, of a corporation. Ascension Parish argues that the "use" of Airplanes I and II occurred in that parish because it is from that location that dominion over the planes was exercised and decisions were made as to when and where they would fly and where they would be hangared when not in use. The taxing authority's conclusion that taxes can be levied on both airplanes under this theory is in error.
The relevant parish ordinances evidence an intent to impose a use tax on tangible personal property after it has "come to rest" in the parish and become "a part of the mass of property" in the parish. The phrase "come to rest" clearly connotes a physical presence in the parish, a requirement which is echoed in the phrase that follows, "and has become a part of the mass of property" in the parish. Yet, Airplane I never landed in Ascension Parish. Airplane II did stop in Ascension Parish, some three months after its purchase, to take on and/or unload passengers, but at that point the airplane's use in interstate commerce had already commenced, and the taxable moment had come to an end.
Moreover, both airplanes were hangared in East Baton Rouge Parish. Louisiana Revised Statutes 47:301(15) defines "storage" as "any keeping or retention in this state of tangible personal property for use or consumption in this state or for any purpose other than for sale at retail in the regular course of business." Thus, "storage" is "use" and this occurred in East Baton Rouge Parish, not in Ascension Parish.
Contrary to the suggestion of the Ascension Parish taxing authority, nothing indicates that the courts should consider domicile of the corporation to override the taxable moment provisions of La. R.S. 47:305(E) and the Ascension Parish ordinances. The legislature, in its discretion, may include considerations of domicile within a tax statute itself. Louisiana Revised Statutes 47:301(1)(f) provides, for the purposes of the imposition of the sales and use tax of any political subdivision, the sale of a vehicle subject to the Vehicle Registration License Tax Law (La. R.S. 47:451, et seq.) shall be deemed to be a retail sale "[i]n the political subdivision of the principal residence of the purchaser if the vehicle is purchased for private use" or "[i]n the political subdivision of the principal location of the business if the vehicle is purchased for commercial use, unless the vehicle purchased for commercial use is assigned, garaged, and used outside of such political subdivision." (Emphasis supplied.) Although that tax statute specifically applies to motor vehicles, there is no similar provision for aircraft, thus making Ascension Parish's focus on domicile of the corporation irrelevant. As this tax provision for the sale of motor vehicles indicates, if the legislature wants the tax *1245 to apply at the domicile, such legislation can be enacted.
Additionally, the section of the Ascension Parish ordinance entitled "Exemptions and Exclusions from Tax" contains a brief but significant provision: "Section 3.03. No tax shall be due under this ordinance on the sale of any goods or personal tangible property delivered . . . outside the territorial limits of the [parish]." This provision immediately follows the Section 3.02 provision that the use tax applies to "tangible personal property after it has come to rest" in the parish and after it "has become a part of the mass of property" in the parish. It is undisputed that the two airplanes were "delivered" to East Baton Rouge Parish after the sale to Word of Life. This section of the ordinance further indicates that the physical location of tangible personal property, not the domicile of the purchaser, is the critical consideration for the purposes of imposing the parish tax at issue.
Our role is not to legislate, but to apply the law as it is written. See La. C.C. arts. 1 and 2. In this case, the plain language of the parish taxing provisions establishes that the use tax authorized by the relevant ordinances is imposed on tangible personal property after it has come to rest in the taxing jurisdiction and has become a part of the mass of property in the jurisdiction. Because, for Airplanes I and II, the "taxable moment" contemplated by the parish ordinances did not occur in Ascension Parish, Ascension Parish does not have the statutory authority to impose a use tax on either airplane.

CONCLUSION
We affirm the judgment of the lower courts for the reasons expressed herein.
AFFIRMED.
VICTORY, J., concurs.
CALOGERO, C.J., and KNOLL, J., concur and assign reasons.
CALOGERO, Chief Justice, concurring.
I agree that this court can properly take judicial notice of the Ascension Parish ordinances governing sales and use taxes, under the provisions of La.Code of Evid. Art. 202(B)(1). Citing that provision, the majority finds that this court can take judicial notice of the five local ordinances because Ascension Parish requested that we do so and "provided [us] with the information needed to comply with the request." However, as far as I can tell, the only information that Ascension Parish provided this court are the dates the ordinances were adopted and the location where those ordinances were recorded in the mortgage books. I concur in the opinion because La.Code of Evid. art. 202(A)(1) also allows this court to take judicial notice of ordinances enacted by any political subdivision of the State of Louisiana even "without the request of a party."
Nevertheless, the copies of the ordinances on which this court relies in this case are not certified. Instead, three of them appear to be printouts of information found on a computer website entitled www.municode.com, while the other two are presumably facsimile copies sent by the Ascension Parish Clerk of Court. Obviously, the better practice would be to require that parties provide certified copies of ordinances, as contemplated by La. Rev.Stat. 13:3712.
KNOLL, Justice, concurring.
I write separately to note that Ascension Parish, a taxing authority, is not permitted to levy a use tax on these planes, as that is prohibited by La.Rev.Stat. 47:305 E. As the majority recognizes, a "taxable moment" occurred which permits Louisiana *1246 to apply the use tax to Word of Life's purchases because the airplanes came to rest in Louisiana. However, not only is Ascension Parish prohibited from levying a use tax on these planes by the parish ordinances, La.Rev.Stat. 47:305 E prohibits a taxing authority from levying a tax when the "taxable moment" did not occur within that taxing authority's jurisdiction. It is appropriate to assume that the Legislature is aware of Louisiana's (and by extension, Louisiana's political subdivisions) expanded right to tax interstate commerce as expressed by the United States Supreme Court in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Oreck, at § 3.5[1], n. 41. Notwithstanding, the Legislature has not changed the law to do so.

ON REHEARING

REHEARING GRANTED.
Rehearing in this case is granted to clarify this court's use of the term "pass through use" in connection with Airplane II. As stated in our original opinion, the term "pass through use" was meant only to convey the idea that Airplane II did not come to rest in Ascension Parish such that there was a taxable moment in that parish. Airplane II merely "passed through" Ascension Parish while it was engaged in interstate commerce. No temporal factor has been added to the determination of "use" for taxing purposes.
With this clarification, our original opinion is affirmed.
WEIMER, J., additionally concurs in the limited grant of the rehearing and assigns reasons.
CALOGERO, C.J., and KIMBALL and KNOLL, JJ., dissent from the partial grant and would grant for a full rehearing.
WEIMER, J., additionally concurs in the limited grant of the rehearing.
I additionally concur in the limited grant of the rehearing to clarify this court's use of the term "pass through use" in connection with Airplane II. As used in our original opinion, the term "pass through use" was meant only to convey a concept embodied in the relevant ordinances. Each time Airplane II landed in Ascension Parish, it remained in transit and thus never "came to rest" within the parish and never became "part of the mass of property" within the parish as required by the relevant ordinances. As such, the "pass through use" of Airplane II in Ascension Parish by Word of Life could not trigger a taxable moment, and could not support imposition of a use tax. Based on the ordinances, there must be a convergence of use and a coming to rest sufficient that the airplane would be a part of the mass of property within Ascension Parish.
With this clarification, I would affirm our original opinion.
NOTES
[1] See Airplane I flight logs, affidavit and deposition of Reverend Leroy Thompson, Jr. However, it should be noted that this was a contested fact. Word of Life argued that Airplane I never landed in Ascension Parish. Conversely, Ascension Parish asserted that Word of Life had imported and used Airplane I in Ascension Parish. Ascension Parish based its claim on the responses that Word of Life made in the pleadings. Word of Life subsequently asserted that the responses were in error, as shown by testimony and other evidence introduced into the record. None of the aircraft travel logs, nor any other evidence or testimony, proved that Airplane I ever landed in Ascension Parish.
[2] Ascension Parish School Board General Sales and Use Tax Ordinance imposing a 1% sales tax effective August 1, 1965, recorded in Mortgage Book 147, page 640, on July 20, 1965;
2. Ascension Parish School Board General Sales and Use Tax Ordinance imposing a 1% sales tax effective June 1, 1980, recorded in Mortgage Book 305, page 594, on August 14, 1981;
3. Ascension Rural Sales Tax District Sales and Use Tax Ordinance imposing a 1% sales tax effective January 1, 1987, recorded in Mortgage Book 390, page 537, on August 28, 1986;
4. East Ascension Consolidate Gravity Drainage No. 1½% sales tax effective December 1, 1984, recorded in Mortgage Book, 355, page 317, on October 12, 1984;
5. Parish of Ascension Sales Tax District No. 2 imposing a ½% sales tax effective October 1, 1994, recorded in Mortgage Book 531, page 805, on October 12, 1994.
[3] House of Representatives Judiciary Committee Report, State Taxation of Interstate Commerce, Report of the Special Subcommittee on State Taxation of Interstate Commerce, H.R.Rep. No. 565, 89th Cong., 1st Sess., Vol. 3 at 607 et.seq. (1965); Pomp and Oldman, State and Local Taxation, 6-3 (4th ed.2001); Jerome R. Hellerstein, Significant Sales and Use Tax Developments During the Past Half Century, 39 VAND. L.REV. 961, 963.
[4] http://www.census.gov/govs/statetax. This approximation represents Louisiana's Government Tax Collections for 2002, 2003, and 2004. The figure includes state but not local tax collection. The Bureau of Census includes gross receipts in this figure. According to Pomp and Oldman, supra, n. 3 at 6-1, "some gross receipts taxes are functionally equivalent to sales taxes, but many gross receipts taxes are intended to fall on businesses and not consumers."
[5] General Accounting Office (GAO) Report, Sales Taxes: Electronic Commerce Growth Presents Challenges; Revenue Losses Are Uncertain, p. 4 (June 2000); Also, See, Susan Kalinka, State Tax Reform: Louisiana Needs To Begin Somewhere, 48 LA.B.J. 374; and John A. Swain, State Sales and Use Tax Jurisdiction: An Economic Nexus Standard for the Twenty-First Century, 38 GA.L.REV. 343, 351 (Fall 2003).
[6] In this respect, the sales tax is distinguished from gross receipts tax which apply to the receipts from more than one stage in the process of production and distribution and which are not separately stated in the sales price either by law or custom. House Judiciary Report, supra, n. 33 at 607. Also, see, Oklahoma Tax Commission v. Jefferson Lines, Inc., 514 U.S. 175, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995).
[7] Walter Hellerstein, Michael J. Mcintyre, and Richard D. Pomp, Commerce Clause Restraints on State Taxation After Jefferson Lines, 51 TAX L.REV. 47, 74 (1995).
[8] Id. at 75-76.
[9] Pomp and Oldman, supra, n. 5 at 9-1.
[10] House Report, supra, n. 3 at 60; Hellerstein and Hellerstein, supra, n. 7 at 16-4; La. R.S. 47:302.
[11] Bruce J. Oreck, Louisiana Sales & Use Taxation, 2-38 (1996)
[12] The United States Supreme Court has made similar determinations in subsequent cases. In Halliburton Oil Well Cementing Co. v. Reily, 373 U.S. 64, 83 S.Ct. 1201, 10 L.Ed. 202 (1963), the court held that equal treatment "for in-state and out-of-state taxpayers similarly situated is the condition precedent for a valid use tax on goods imported from out-of-state." Id. at 70, 83 S.Ct. 1201. In Maryland v. Louisiana, 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981), the court struck down Louisiana's "First Use" tax on imported gas because "the pattern of credits and exemptions allowed under the . . . statute undeniably violates this principle of equality." Id. at 759, 101 S.Ct. 2114. In Oklahoma Tax Commission v. Jefferson Lines, Inc., 514 U.S. 175, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995), the court opined that "equality of treatment of interstate and intrastate activity has been the common theme among the paired (or `compensating') tax schemes that have passed constitutional muster. . . ." Id. at 192 n. 6, 115 S.Ct. 1331. Further, the court stated that "(w)e have indeed never upheld a tax in the face of a substantiated charge that it provided credits for the taxpayer's payment of in-state taxes but failed to extend such credit to payment of equivalent out-of-state taxes." Id.
[13] Cotten, supra, did not concern the exclusion found in La. R.S. 47:305(E) that is at the heart of the case sub judice. Instead, Cotton, supra, focused on the statutory interpretation of La. R.S. 47:306.1. Petitioners in the case sought to avail themselves of the special provisions found in La. R.S. 47:306.1 for interstate transportation dealers. However, the court held that the statute was clear and unambiguous and that petitioners had filed the required application untimely. Id. at 501. Nonetheless, Ascension Parish, in the present case, interprets Cotton, supra, as evidence that the Legislature, when it enacted La. R.S. 47:306.1, contemplated that airplanes, trucks, and other vehicles used in interstate travel would be subject to tax except at a different rate based on a statutory formula.
[14] In Comdisco, the court of appeal held that the airplane purchased in Kansas, then leased in Louisiana to Louisiana resident was not exempt from taxation under La. R.S. 47:305(E). The court reasoned that the use being taxed was the act of bringing the plane into Louisiana for the purposes of leasing it, as opposed to the lessee's use of the plane, and thus, assessment did not impose a charge for engaging in interstate commerce. Id.
[15] The trial court decided the case on summary judgment, therefore, the record is not fully developed and sheds no light on what took place from the point of importation into East Baton Rouge Parish to the point where the planes were once again used in interstate commerce. However, whether the planes were made ready for use, registered, or simply left to sit, the planes were under the exercise and control of the taxpayer.
[16] Oreck, supra, n. 21 at 3-19.
[17] Next, this court recognized that Complete Auto, supra, repudiated the formalistic approach that defined traditional commerce clause cases. Id. at 524. This court then applied the four-prong test to the facts before it. First, the court held that the substantial nexus test was satisfied because Columbia Gulf's pipeline and four compressor stations carried natural gas from offshore Louisiana to the state's borders, and Columbia Gulf paid Louisiana taxes on its employees and activities within the state. Second, the court concluded that the tax was non-discriminatory because gas in interstate commerce was taxed equally with intrastate gas when both were consumed in Louisiana. Third, the court determined that the tax was fairly apportioned because it was imposed only on gas consumed in Louisiana. Fourth, the court held that the tax was fairly related to services provided by Louisiana since Columbia's employees enjoyed the benefits of Louisiana's roads, schools, fire and police protection. Id.
[18] This statute's legislative history adds nothing to support this case.
[19] The other four ordinances at issue are identified in footnote 2, supra.